LUTHER STATLER *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. WILLIAM CATALANO *et al.*, Defendants-Appellants and Cross-Appellees.

Fifth District   No. 5—86—0743

Opinion filed March 22, 1988.

Mateyka, Hill & Hill, P.C., of Edwardsville, for appellants.

G. Edward Moorman, of Alton, for appellees.

JUSTICE LEWIS delivered the opinion of the court:

This cause comes before us on appeal from a judgment entered on June 26, 1986, in Madison County finding defendants William and Dorothy Catalano, hereinafter referred to as defendants, liable for damages, both actual and punitive, in an action for private nuisance. Defendants also appeal an injunction order entered in this case on October 1, 1986. Plaintiffs Luther and Charleen Statler, hereinafter referred to as plaintiffs, cross-appeal the injunction order.

Plaintiffs' original complaint was filed on November 29, 1979. This complaint was amended several times but the third amended complaint filed on February 19, 1985, presented the cause of action which was resolved by the jury and the circuit court. Plaintiffs' third amended complaint alleged that defendants intentionally deposited rubbish on defendants' property, but along the boundary line between plaintiffs' property and defendants' property, and alleged that defendants intentionally lowered the lake level contained on plaintiffs' property, which actions deprived plaintiffs of the peaceful use and enjoyment of their property. For this harm, plaintiffs sought actual damages. Because plaintiffs also considered defendants' conduct to be malicious, they further sought punitive damages. Plaintiffs' amended complaint also included a count which asked the court to enter an injunction order requiring defendants to be enjoined from altering the lake level, to be enjoined from constructing barriers in the lake bed, to be ordered to restore the spillway and earthen dam, to be ordered to restore the lake to its previous condition and to be ordered to permit plaintiffs access to and use of the entire lake. After a jury trial on the cause of action, the jury awarded the plaintiffs $55,841 in actual damages and $42,250 in punitive damages. The circuit court considered plaintiffs' request for injunctive relief and issued an injunction order.

On appeal, defendants raise the following issues: that the case was tried and that evidence was presented on nonpleaded theories of law; that the jury was misled by the instructions; that the damages, both actual and punitive, were excessive and based on improper elements; and that the circuit court's injunction order was improper. Because the circuit court's injunction order failed to include plaintiffs' claimed right to use and to have access to the entire lake, plaintiffs cross-appeal the injunction order.

Before discussing the issues, a recitation of the facts is necessary. In December 1972, the Millers owned 80 acres of property in Madison County, Illinois. In January 1973, plaintiffs formalized a contract for sale with the Millers to purchase 8.06 acres of the Millers' property. When the plaintiffs bought the land, there existed a man-made lake which was primarily on the Millers' property but which extended onto the plaintiffs' property. This lake was created in 1930 when the Civilian Conservation Corps built an earthen dam which allowed water to collect to form the lake. The portion of the lake on the plaintiffs' property was approximately 35 to 40 feet in width and 125 feet long, was a depth of approximately four to six feet, and came to within 50 feet of plaintiffs' home. Up until 1979, the lake level fluctuated in height only by a matter of inches.

The contract for sale signed by the Millers and the plaintiffs contained the following provisions: ''Lake privileges are granted to buyer and immediate family and if boats are used no gas motors allowed''; and "Buyer has permission to draw water from lake for own use." The deed to the 8.06 acres was also executed in January 1973 and duly recorded, but the sales contract was never recorded. The deed contained no language regarding lake privileges. The purchase price of the plaintiffs' property was $27,500. The Millers retained possession of the remaining 72 acres of land, which bordered the plaintiffs' property on the east and south.

Before moving onto their property in May 1973, the plaintiffs renovated an existing clubhouse located on their property to make it into a home. The plaintiffs improved this structure by building several rooms, by adding a garage, and by constructing a deck. They also renovated the inside of the clubhouse. A couple of years previous to trial of this cause, the plaintiffs added a solar heating room to their home. Throughout the years of their occupancy the plaintiffs had landscaped their property.

While the Millers and the plaintiffs were neighbors, the plaintiffs and their children shared and enjoyed the use of the entire lake with the Millers. The plaintiffs used the lake for fishing, for swimming and

to irrigate their garden and shrubbery. A dock extended onto the lake from the plaintiffs' property. The plaintiffs had friends over to fish and to swim in the lake or to sit on their deck and enjoy the aesthetic charm of the lake.

In June 1975, the defendants purchased the 72 acres of land from the Millers and moved onto the property. Their son, William Catalano, Jr., moved onto the property after his parents sold him five acres of land and upon which he built a home. This occurred approximately a year and a half after his parents purchased the land. Before their son constructed his house, he approached the plaintiffs about buying their home but the plaintiffs were unwilling to sell. The defendants moved off the property in 1977 or 1978 but moved back when their son exchanged homes with them.

Since the area was zoned for agricultural use, William Catalano, Jr., kept some livestock on the property and cultivated eight acres of alfalfa. The defendants also leased out 25 acres for farming to a nearby farmer. A fence separated the defendants' and the plaintiffs' property to keep the livestock from roaming onto the plaintiffs' land. The lake was used to water the livestock and it was also the main water source for William Catalano, Jr.'s, home. However, the plaintiffs continued to use the lake for swimming and for fishing from 1975 until 1979.

In July 1979, the plaintiffs noticed that the lake level was receding. The plaintiffs inspected the earthen dam and the overflow spillway structure and found that a man-made ditch had been dug below the spillway tube, allowing the lake level to drop. This ditch was approximately 3½ feet deep and approximately 12 to 14 inches wide and ran from the edge of the lake to the spillway box and then ran parallel to the spillway tube. Additionally, the spillway tube, which was constructed of a metal tube surrounded by concrete, had two holes in it which were man-made.

The plaintiffs' daughter was swimming in the lake in July 1980 and she discovered a barbed wire fence had been erected across the lake at the plaintiffs' and defendants' property line. Also at this time, defendant William Catalano and his sons constructed a rock barrier in the lake along the defendants' property line. This rock barrier effectively barred the plaintiffs from the lake and prevented the lake from extending onto plaintiffs' property. The defendants discussed the use of the lake with the Millers in September 1980 and Mr. Miller advised the defendants of the agreement about the lake between the Millers and the plaintiffs. After the construction of the rock barrier, the plaintiffs were unable to use or to enjoy the lake and their property became a

mudhole where the lake had formerly been.

Also in the summer of 1980, defendant William Catalano began depositing debris and rubbish on his property along the plaintiffs' south boundary and along the earthen dam, in clear view of the plaintiffs' home. The debris consisted of, but was not limited to, old commodes with plastic flowers in them, used tires, bathtubs, rusted barrels, torn upholstered furniture with the stuffing protruding and broken machinery. While the makeup of the debris collection varied, a considerable amount of debris remained constantly for a period of approximately five years.

In 1981 a picket fence was placed on the top of the rock dam in the lake and "no trespassing" and "private lake" signs were posted on the fence. Also that summer, the plaintiffs had windows in their home and in their garage broken by bullets shot onto their property. Although no one was seen shooting guns at the plaintiffs' home, the trajectory of the bullets indicated that they came from the defendants' property. The chief of the university police of Southern Illinois University came to the plaintiffs' home to see the bullet hole damage. It was at this time that shooting trophies were observed sitting on a picnic table near the property line. The trophies had on them statues of men aiming rifles, and the trophies were placed so that the rifles were aimed at the plaintiffs' home. After sustaining the damage to their windows, the plaintiffs went on an unscheduled vacation.

In addition to the lowering of the lake, to the accumulation of the debris along the property lines, and to the shooting incidents, the record also reveals that the plaintiffs were randomly subjected to bright lights being shone on their property at various times of night and to radios playing loudly all night long.

The explanation offered by defendants at trial for the man-made ditch was that it was dug to determine what repairs were needed for the spillway tube, but no repairs to the spillway tube were ever made. The bright lights which shone onto the plaintiffs' property at night were explained as lights of tractors used in farming. The bullet holes in plaintiffs' windows were attributed to hunters. Defendant William Catalano admitted that he deposited the debris on his property at the plaintiffs' boundary.

The foregoing evidence was before the jury. It should also be noted that prior to either party presenting evidence, the jury viewed the plaintiffs' and the defendants' property. After their deliberations, the jury returned a verdict in favor of the plaintiffs and awarded the plaintiffs actual and punitive damages.

Against this background, we now consider the issues raised on ap-

peal. Defendants do not contest that the evidence presented at trial was insufficient to support the jury's verdict, but defendants only complain that evidence was presented on nonpleaded theories of law, *i.e.*, trespass and intentional infliction of emotional distress. They state that the evidence of the shooting of bullets constituted evidence of trespass and that the evidence presented by a psychologist about plaintiffs' discomfort caused by defendants' actions supported a cause of action of intentional infliction of emotional distress. We find this argument without merit.

■■■ To constitute a private nuisance, it must be shown that the act complained of invaded another's interest in the use and enjoyment of his land. The invasion must be substantial, be either intentional or negligent, and be unreasonable. (*Woods v. Khan* (1981), 95 Ill. App. 3d 1087, 420 N.E.2d 1028.) The standard for determining if particular conduct is unreasonable is determined by the effect it would have on a normal person of ordinary habits and sensibilities. (*Belmar Drive-In Theatre Co. v. Illinois State Toll Highway Comm'n* (1966), 34 Ill. 2d 544, 216 N.E.2d 788.) While the shooting of bullets onto another's property is evidence of trespass, it equally is evidence of nuisance. These causes of action may overlap. (Restatement (Second) of Torts §821D, at 102 (1979).) The shooting of bullets into one's home certainly qualifies as a nuisance, as it is an intentional and unreasonable invasion of a person's use and enjoyment of his home. Therefore the evidence of the shooting of bullets onto plaintiffs' property was relevant to the cause of action of private nuisance.

Further, the psychologist's testimony presented at trial proved that defendants' actions were causing plaintiffs' annoyance and extreme discomfort. This evidence, too, is relevant, as it relates to the element of material annoyance of plaintiffs and relates to the use and enjoyment of plaintiffs' home. We cannot conclude that this evidence was not relevant in an action for private nuisance.

Additionally, it should be noted that defendants never objected at trial to the relevancy of the evidence of which they now complain. It has been held by this court that "where a party introduces or brings out evidence bearing on issues not presented by the pleadings, or fails to object to evidence offered by the adverse party, an objection that a certain matter is not in issue under the pleadings is waived." (*Beck v. Capitol Life Insurance Co.* (1977), 48 Ill. App. 3d 937, 942, 363 N.E.2d 170, 173-74.) The record reveals that defendants were not surprised or prejudiced by the testimony plaintiffs presented. Defendants presented evidence in their case in chief to explain the shooting incidents and they cross-examined the psychologist. Thus, since defendants did not

object to the evidence of the shooting of the bullets onto plaintiffs' land or to the psychologist's testimony, they waived this issue.

Defendants also challenge the damages award on appeal. They contend that the damages, actual and punitive, are excessive and are based on improper elements. Defendants also raise the following subissues which relate to the damages award: They contend that because the damages were a quotient verdict, the damages awarded were improper. They also state that assessing the damages against Dorothy Catalano, simply because she was a joint tenant of the defendants' property, was improper.

■ Initially it must be noted that the amount of a verdict is mainly within the discretion of the jury. (*Kitsch v. Goode* (1977), 48 Ill. App. 3d 260, 362 N.E.2d 446.) While a jury's determination may be reviewed, the review will only extend to whether the total amount of the award is within the necessary flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience. (*Kitsch*, 48 Ill. App. 3d 260, 362 N.E.2d 446.) It cannot be said that the damages awarded in this case are unfair or are unreasonable, nor are the damages so large that they shock the judicial conscience.

■ Defendants' argument that the actual damages were based on improper elements rests on the damages instruction given to the jury. That instruction listed the following elements of damages to be considered:

"1. Expenses incurred;

2. The value of the loss of the Statlers' use of the lake;

3. The value of the loss of the enjoyment of the Statlers' home."

This instruction included the proper element of damage to be considered in a private nuisance case.

Whenever a harm to land occurs from a past invasion, the elements of damage to be considered are the difference in the value of the land before and after the harm, the loss of the use of the land, and the discomfort and annoyance to the party harmed as an occupant. (Restatement (Second) of Torts §929, at 544 (1979).) Since these three elements are disjunctive, a plaintiff could elect to collect for one or more elements of damage. However, the limited case law in the area of nuisance indicates that the proper measure of damages for a permanent nuisance is the market value of the land, while the proper measure of damages for a temporary nuisance is the discomfort and deprivation of the use and enjoyment of a person's home. *O'Brien v. City of O'Fallon* (1980), 80 Ill. App. 3d 841, 400 N.E.2d 456; *Kugel v. Village of Brookfield* (1944), 322 Ill. App. 349, 54 N.E.2d 92.

In this case, the distinction between a permanent versus a temporary nuisance was never presented to the jury. While this categorization determines the element of damage to be considered, we cannot determine that the failure to categorize the nuisance in this case as temporary or permanent negates the actual damages awarded. Defendants, in their brief, classify the defendants' conduct as a temporary nuisance. The injunction order also supports the inference that this was a temporary nuisance, as it required the defendants to restore the lake to its previous condition, an act which would remove the nuisance. Because the damage instruction for actual damages given to the jury restricted the elements of damage to be considered to the deprivation of plaintiffs' use and enjoyment of their home, the jury considered the proper element of damages for a temporary nuisance.

The fact that the damages instruction for actual damages included an improper element of damage, expenses incurred, does not destroy the jury's determination. The only evidence presented to the jury on expenses incurred was $56 expended by the plaintiffs to purchase a weed killer for the lake and approximately $900 spent on an unscheduled vacation taken because of plaintiffs' discomfort with the situation. Because this total amount of $956 is minimal when compared to the $55,841 actual damages awarded and because the verdict was a general verdict and did not itemize the elements for which the damages were awarded, it cannot be concluded that this element was a major consideration in the jury's determination, and the error of including expenses incurred in the damages instruction can only be deemed as harmless.

Further, the actual damages awarded conformed to the evidence presented and were not excessive. It has been held that the measure of damages for injury due to nuisance is the injury and annoyance of the plaintiff and the amount recoverable "cannot be gauged by any definite rule." (*Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 146, 281 N.E.2d 323, 325.) In this case plaintiffs were subjected to the depositing of debris along their property line and in clear view of their home for a period of five years. The only purpose defendants had for the dumping of this rubbish was to annoy their neighbors. These actions by the defendants, coupled with the shooting incidents and the other apparent acts of harassment, effectively deprived the plaintiffs of the peaceful use and enjoyment of their home for at least five years. Also, the defendants' intentional lowering of the lake level was a significant harm to the plaintiffs. Whenever "an invasion involves a detrimental change in the physical condition of land, there is seldom any doubt as to the significant character of the invasion." (Re-

statement (Second) of Torts §821F, at 105 (1979).) The draining of the lake by the defendants altered the plaintiffs' portion of the lake into a swampy mudhole. Prior to the defendants' actions, the plaintiffs had been able to swim and to fish in at least a portion of the lake. Now that is no longer possible. The plaintiffs had enjoyed the use of the lake for approximately six years, and the lake had been a primary consideration in the plaintiffs' purchase of the property. The jury rightfully determined that the deprivation of the plaintiffs' peaceful use and enjoyment of their home was a significant harm. We cannot find that the actual damages awarded in this case were excessive or that they were based on improper elements.

The issue of punitive damages raises another consideration. Whether punitive damages can be awarded in nuisance cases appears to be a matter of first impression in Illinois. Given the facts in this case and the legal principles involved for punitive damages, we have determined that the awarding of punitive damages was proper, and the amount of the punitive damages was not excessive.

The purposes of punitive damages are to punish a person for doing a wrongful act and to discourage a defendant and others from similar conduct in the future. (Restatement (Second) of Torts §908, at 464 (1979).) Punitive damages may be awarded when a tort is committed "with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others [citation]." (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 186, 384 N.E.2d 353, 359.) "In determining the amount of punitive damages, as well as in deciding whether they should be given at all, the trier of fact can properly consider not merely the act itself but all the circumstances including the motives of the wrongdoer, the relations between the parties and the provocation or want of provocation for the act." (Restatement (Second) of Torts §908, Comment *e*, at 466 (1979).) Additionally, just as the awarding of actual damages is within the discretion of the jury, so too are the awarding of punitive damages, and a reviewing court will not reduce the amount of punitive damages awarded unless the award is clearly excessive. *Smith v. Seiber* (1984), 127 Ill. App. 3d 950, 469 N.E.2d 231.

The evidence in this case supports the jury's determination in awarding punitive damages in the amount of $42,250. Clearly defendants' actions were malicious, as they were only done with the intent of annoying the plaintiffs. The depositing of debris and the intentional lowering of the lake was of no purpose except to harass plaintiffs. The lowering of the lake level was an outrageous act designed to deprive

plaintiffs of the use of the entire lake. The record reflects no provocation on the part of the plaintiffs to warrant defendants' actions. Because of the ongoing nature of defendants' actions for a period of five years, because the awarding of punitive damages is largely a matter of discretion for a jury, because defendants actions were extremely outrageous and malicious, and because the punitive damages were not excessive in these circumstances, this court will not reverse or reduce the punitive damages.

■ We will briefly consider defendants' subpoints regarding the issue of damages. In a post-trial motion filed by defendants, they allege that the jury's damages verdict was a quotient verdict and therefore improper. To support their motion defendants attached an affidavit of one juror and a sworn recorded statement of another juror. Both documents were obtained after the jury trial had ended and after a verdict had been rendered. These documents state that each juror was asked by the jury foreperson to write a monetary amount on a slip of paper. These pieces of paper were given to a juror who read each amount while the foreperson wrote the amounts on a separate paper. After all the amounts were read, the foreperson added these amounts and divided that amount by 12. This amount was read by the foreperson and was inserted on the verdict form. This process was done twice, once for the actual damages and once for the punitive damages. Both jurors who provided these statements to the defendants stated they were not in agreement with either the amount of damages awarded for actual damages or for punitive damages.

Generally, an affidavit of a juror may be used to support a jury's verdict but it may not be used to impeach or to controvert a verdict. (*Kelley v. Call* (1944), 324 Ill. App. 143, 57 N.E.2d 501.) However, a quotient verdict arrived at "after an agreement by jurors to arrive at the amount of the verdict by aggregating the vote of all jurors and dividing the result by twelve, is void." (*Kelley v. Call*, 324 Ill. App. at 148, 57 N.E.2d at 503.) To set aside a damages award, it must be clear that a jury agrees in advance to be bound by the average figure. (*German v. Illinois Power Co.* (1983), 115 Ill. App. 3d 977, 451 N.E.2d 903.) The documents in this case do not reflect that the jury agreed in advance to be bound by an average figure. Further, neither document demonstrates that the damage awards were the aggregate of 12 figures divided by 12. The documents only reflect that these two jurors surmise that this method was the one used; neither juror saw the paper upon which the calculations were made. Additionally, both jurors, when polled after the giving of the verdict, swore that the verdicts were their verdicts. We would not be warranted in disturbing the ver-

dict of the jury in this case given these facts.

■ Defendants contend that actual and punitive damages were assessed against defendant Dorothy Catalano and that this was erroneous. The basis of this contention is that Dorothy Catalano was not present when defendant William Catalano's actions occurred and that she had no knowledge of these actions. The record belies this argument. Dorothy Catalano's testimony established that she fished at the lake. The debris that was deposited by her husband was completely visible from the lake and unsightly enough to draw attention, so it was not unreasonable for the jury to infer knowledge of this act to her. Additionally, Dorothy Catalano testified that she was present on different occasions during the construction of the rock dam. This demonstrated her knowledge of the rock barrier. The Restatement (Second) of Torts states that a possessor of land is subject to liability where a third person causes an actionable nuisance and

"(a) the possessor knows or has reason to know that the activity is being carried on and that it is causing or will involve an unreasonable risk of causing the nuisance, and

(b) he consents to the activity or fails to exercise reasonable care to prevent the nuisance." (Restatement (Second) of Torts §838, at 157 (1979).)

Dorothy Catalano met this standard of liability, as she knew of the activity and as she failed to exercise reasonable care to prevent it. Since she was a joint tenant of the property and therefore a "possessor," she is equally liable for the damages awarded.

■ Defendants next contend that certain instructions given to the jury were misleading. In their argument of this issue defendants refer to five jury instructions. We find that defendants have waived any error regarding the instructions. To preserve an objection to an instruction for review, "one must set it forth with specificity so the trial court is advised of the specific nature of the objection before ruling." (*Saldana v. Wirtz Cartage Co.* (1978), 74 Ill. 2d 379, 387, 385 N.E.2d 664, 668; 107 Ill. 2d R. 239(b).) Further, questions on instructions need not be reached on appeal where a post-trial motion was not sufficiently specific to preserve the objection. (*Brown v. Decatur Memorial Hospital* (1980), 83 Ill. 2d 344, 415 N.E.2d 337.) Defendants' objections to the instructions complained of were not set forth with enough specificity to preserve their objection nor was their post-trial motion sufficiently specific to save their objections.

One of the instructions discussed in defendants' brief was the issues instruction. Defendants, in their brief, state that the issues instruction misled the jury in that the language used allowed the jury to

conclude that the fence and rock barrier erected on defendants' property was actionable. At the instructions conference, defendants objected generally to this instruction. In defendants' post-trial motion their objection to the issues instruction was as follows:

"45. The issue instruction, Exhibit A.

a. The instruction is contrary to law.

b. The instruction is not supported by credible occurence [sic] and expert witnesses that plaintiffs had any right, title or interest in and to said artificial pond, that they were littoral proprietors, that their rights as littoral proprietors placed any duty whatsoever on the defendants.

c. That the allegation 'approximate property line' is vague and prejudicial; that the undisputed evidence of defendants' surveyor locates the fence or barrier solely on the defendants' property.

d. That the references to Counts I thru [sic] IV is misleading and prejudicial."

These objections do not coincide with the argument presented in defendants' brief, and since the objection made at the instructions conference was not specific, the specific objection to the issues instruction raised on appeal has been waived.

Another instruction defendant takes issue with reads as follows:

"Although erection of a fence or structure has the effect of depriving an adjacent owner of a pleasing view of his neighbor's land, if the fence is not made of offensive materials, it will not give rise to an action for damages unless the manner in which the fence was constructed is unreasonable, obstructs the reasonable and comfortable use of the property, and produces material annoyance, discomfort, and hurt."

At the instructions conference, this instruction was tendered by defendants. After the court's and plaintiffs' modification of the instruction, defendants' only objection was the lack of testimony presented at trial to support the instruction. Defendants did not raise an objection to this instruction in their post-trial motion. Defendants' argument on appeal takes issue with the language "offensive materials" used in this instruction. Since defendants' objection at the instructions conference differs from their objection raised on appeal and since no objection to this instruction was raised in their post-trial motion, defendants have waived the objection to this instruction.

Defendants also take issue with the actual damages instruction. Defendants contend that the damages instructions did not place a time limitation as to when damages could be awarded, i.e., that damages

could not be awarded after a complaint has been filed nor could damages be awarded for future damages. At the instructions conference, defendants' objection to this instruction was that it presented improper elements of damage. However, defendants did not specify which of the elements of damage were improper, whether all the elements of damage were improper or how the elements of damage were improper. This objection is not sufficiently specific to preserve their objection on review. Defendants also did not raise an objection to the damages instruction in their post-trial motion. Since the defendants' grounds for their objection in their brief differs from any objection raised at trial, they have waived consideration of this issue.

Two additional instructions are included in defendant's argument that the jury instructions were misleading. From the common law record it appears that these two instructions were never given to the jury. Therefore these instructions do not merit our consideration.

Further, defendants cite no authority to support their argument regarding the jury instructions. This is true of other arguments raised in defendants' brief. This court in *In re Estate of Kunz* (1972), 7 Ill. App. 3d 760, 288 N.E.2d 520, dismissed an appeal because the appellants did not cite any authority nor did the briefs of counsel aid the court, as the briefs were not properly prepared. As this court stated in that case:

> "If the questions involved in a case are of sufficient importance to justify asking this court to decide them, they are worthy of the careful consideration of counsel presenting them. If the case is not properly presented and the court is not given the benefit of precedents there is danger of a decision being rendered that will not be in harmony with the weight of authority. It is the duty of attorneys practicing in this court to present to the court the authorities supporting their views and to assist the court in reaching a correct conclusion." (*In re Estate of Kunz*, 7 Ill. App. 3d at 763, 288 N.E.2d at 522, citing *Kelley v. Kelley* (1925), 317 Ill. 104, 147 N.E. 659.)

This same admonishment applies to this case. The defendants in this case failed to cite authorities to support their contentions in several of their arguments and neither parties' brief is particularly enlightening as to the issues raised on appeal. Therefore, with regard to those arguments for which no authorities have been cited, those issues have been waived on appeal. *Pecora v. Szabo* (1982), 109 Ill. App. 3d 824, 441 N.E.2d 360.

■ The last issue on appeal pertains to the appeal by defendants and to the cross-appeal by plaintiffs of the injunction order entered by

the circuit court. The injunction count of plaintiffs' complaint was considered separate from the other counts of the complaint by the circuit court. Defendants, on appeal, contend that the injunction order was erroneously entered by the circuit court on October 27, 1986, as the injunction order was based on improper elements. Defendants do not clarify what the improper elements were which were considered by the court nor do they support their argument by any citation to authority. Because defendants have presented bare argument unsupported by case law or statutory law, they have waived this issue on appeal. *Pecora v. Szabo*, 109 Ill. App. 3d 824, 441 N.E.2d 360.

Plaintiffs, in their cross-appeal of the injunction order, contend that the circuit court erred when it refused to enjoin defendants from interfering with their use of the entire lake. At trial, the circuit court had determined from case law presented by counsel that plaintiffs only had a property right to that portion of the lake that was above their land and that they did not have a right to use the entire lake. By its determination, the circuit court found that plaintiffs had no clear legal right to the use of the entire lake. It has been held that injunctive relief is an extraordinary remedy, not granted as a matter of course, but only granted after a plaintiff has established the existence of "a certain and clearly ascertainable legal right, irreparable harm and an inadequate remedy at law." (*In re Marriage of Sherwin* (1984), 123 Ill. App. 3d 748, 753, 463 N.E.2d 755, 758.) Further, the granting of an injunction is a matter of discretion for a circuit court. (*Hannan v. Watt* (1986), 147 Ill. App. 3d 456, 497 N.E.2d 1307.) A reviewing court will only look to whether the circuit court properly exercised its broad discretionary powers when it granted or denied injunctive relief and will only overturn a circuit court's ruling where there has been a manifest abuse of discretion. (*Hannan v. Watt*, 147 Ill. App. 3d 456, 497 N.E.2d 1307.) Here plaintiffs did not meet their burden of proof to show that they had a certain and clearly ascertainable legal right to use the entire lake. To the contrary, the circuit court had ruled that they did not. Therefore, we cannot determine that the circuit court manifestly abused its discretion when it failed to enjoin defendants from preventing plaintiffs the use of the entire lake.

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

Affirmed.

KARNS and CALVO, JJ., concur.