JOSEPH TAMALUNIS *et al.*, Plaintiffs-Appellees, v. THE CITY OF GEORGETOWN, Defendant-Appellant (Joseph S. Dalida *et al.*, Defendants).

Fourth District   No. 4—88—0677

Opinion filed June 28, 1989.—Rehearing denied August 30, 1989.

174

Gregory C. Ray and Paul G. Prendergast, both of Craig & Craig, of Mattoon, and Kenneth W. Blan, Jr., of Blan Law Offices, of Danville, for appellant.

Warren E. White, of Danville, for appellees.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

This appeal involves a nuisance action brought by the plaintiffs against the City of Georgetown (City) for the discharge of untreated sewage from a sewer overflow located at Seminary Street in Georgetown into a stream running across plaintiffs' property. The jury awarded plaintiffs $150,000 in compensatory damages for the nuisance and a permanent injunction was entered against the continued discharge of the sewage. The injunction was stayed pending this appeal.

The City presents six issues for our consideration: (1) whether the court erred in granting plaintiffs' motion for summary judgment on count I; (2) whether the court lacked subject-matter jurisdiction to

decide counts II and III of plaintiffs' complaint; (3) whether the court erred in finding this case involved a temporary nuisance; (4) whether the court erred in denying the City leave to amend its answer to include affirmative defenses; (5) whether the trial errors and misconduct of plaintiffs' counsel denied the City a fair trial; and (6) whether the court erred in entering a permanent injunction against the discharge of overflow sewage onto plaintiffs' property.

We affirm in part and reverse in part.

This case began on May 5, 1983, when plaintiffs filed a complaint against the City and various city officials for the continual discharge of untreated sewage onto their property. In count I, plaintiffs sought a declaratory judgment as to the ownership of the real estate over which a stream, known as Seminary Creek, runs. The sewage is discharged into this stream from the overflow located at Seminary Street. In count II, the plaintiffs sought compensatory and punitive damages for the City's discharges of untreated sewage, industrial waste, and other pollutants onto their property from the overflow. In count III, the plaintiffs requested a permanent injunction against the discharge of this sewage and an order requiring the City to remove any sewage and pollution on plaintiffs' property and to restore their property to its natural environment.

Plaintiffs' property, also known as lot 24, includes 10 acres and was purchased in 1960. It is bounded on the west by Seminary Street. The City owns and operates a combined sewage-storm water sewage system which serves approximately 4,213 residents in the City. Two-thirds of the sewer system is serviced by a 54-inch sewer tile, or main outlet sewer, which terminates at Seminary Street on the western edge of plaintiffs' property. At Seminary Street, the 54-inch sewer tile reduces to a 15-inch sewer tile, which runs underground through plaintiffs' property to a sewage treatment plant near Ellis Branch, located approximately 1,500 feet from the easterly boundary of plaintiffs' property.

The sewer system was constructed in 1913. The 15-inch sewer tile, or outlet sanitary sewer, was designed to carry untreated sewage from the main outlet sewer underground to a septic tank located at Ellis Branch. The septic tank was later replaced by a sewage treatment plant in 1961-62. At the Seminary Street overflow, which runs under Seminary Street, where the 15-inch tile receives the sewage, any storm water in the sewer system flows into Seminary Creek, which runs across plaintiffs' land in an easterly direction toward Ellis Branch.

In count I, plaintiffs sought a declaratory judgment as to the

ownership of the real estate over which Seminary Creek runs. Plaintiffs contended the City acquired only an easement in this property in a condemnation action in 1913, where plaintiffs' predecessor in title to lot 24, Charles Madden, was paid $200 for lands taken to construct the sewer system. The City claimed fee simple title was acquired to the subject real estate, which is 20 feet wide, being 10 feet measured at right angles to either side of the center of Seminary Creek.

In count II, plaintiffs contended the 15-inch underground sewer tile was not large enough to handle all of the sewage and therefore, the excess sewage flowed onto plaintiff's property and into Seminary Creek. Plaintiffs further contended in their complaint that they repeatedly complained to City officials about the discharges; that the Illinois Environmental Protection Agency (EPA) filed a complaint in 1978 against the City for violations of the Environmental Protection Act (Act) (Ill. Rev. Stat. 1985, ch. 111½, par. 1001 et seq.), and that the Pollution Control Board (PCB) ordered the discharges of untreated sewage abated in 1979 but the City continued to discharge sewage onto plaintiffs' property.

The City answered the complaint on May 31, 1983. In the answer, the City denied liability for the discharge of sewage, admitted the violations of the Act and the findings of the PCB in 1979, asserted title to the 20-foot-wide strip by virtue of the 1913 condemnation action, and further asserted that the 1913 damages paid to plaintiffs' predecessor in title were adequate compensation for the plaintiffs. The City did not include any other affirmative defenses in the answer.

Plaintiffs filed a motion for summary judgment on counts I and III and on the issue of liability alleged in count II. On November 28, 1984, plaintiffs' motion was granted as to count I. The trial court concluded that the City acquired an easement for the underground sewer in the 1913 condemnation action. This easement extended to the surface, 10 feet at right angles to each other on either side of the creek, for the purpose of constructing, repairing, and cleaning or maintaining the underground sewer line. The November 1984 order did not include a finding under Supreme Court Rule 304(a) (107 Ill. 2d R. 304(a)).

A jury trial on count II was conducted in April 1985. On April 18, 1985, the jury found for the plaintiffs and awarded $127,750 in compensatory damages and $255,500 in punitive damages. In its post-trial motion, filed on May 15, 1985, the City requested that the verdict be set aside, the judgment be vacated, and a new trial

granted. The City claimed that the errors in the introduction of evidence, jury instructions, and conduct of plaintiffs' trial counsel led to the grossly excessive verdict for the plaintiffs. The City also claimed the court erred in characterizing the nuisance as a temporary rather than a permanent nuisance.

On June 25, 1985, the trial court set aside the punitive damage award, after concluding that the City was not liable, as a matter of law, for the punitive damages. On January 14, 1986, the trial court also set aside the award of compensatory damages, finding any evidence or discussion regarding punitive damages could have influenced the award for compensatory damages. A new trial on the issue of damages was ordered on January 14, 1986.

Plaintiffs appealed the vacation of both damage awards and order for a new trial to this court. The City raised no issues in the first appeal. The orders of the trial court on January 14, 1986, were affirmed by this court. *Tamalunis v. City of Georgetown* (1987), 150 Ill. App. 3d 1162 (unpublished order under Supreme Court Rule 23).

Prior to the second trial, the City filed on November 4, 1987, a motion to dismiss counts II and III for want of subject-matter jurisdiction. The City alleged the PCB was the sole entity, by virtue of the Act, with jurisdiction over actions regarding the discharge of sewage. (Ill. Rev. Stat. 1985, ch. 111½, par. 1001 *et seq.*) The motion to dismiss was denied on December 30, 1987.

On January 28, 1988, the City filed a motion for reconsideration of its post-trial motion filed May 5, 1985, and a motion for leave to file an amended answer to count II. The proposed amended answer included five affirmative defenses to the City's liability as alleged in count II. These defenses included: (1) governmental immunity under the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1985, ch. 85, par. 1—101 *et seq.*) (Governmental Immunity Act); (2) the 1913 condemnation action was *res judicata* to all claims raised by the plaintiffs; (3) the failure of a municipality to enact an ordinance, the only legal method whereby the City could repair the sewer system, was not actionable under the Governmental Immunity Act; (4) the City was operating the sewer system in compliance with a National Pollutant Discharge Elimination System permit issued by the Illinois EPA and, therefore, the plaintiffs had no cause of action; and (5) a stipulation entered in litigation in 1939 between the City and the Gosses, other predecessors in title to the plaintiffs, imposed a burden in the nature of an easement on plaintiffs' property, which runs with the land. The court denied the City's motions on March 21, 1988.

Prior to trial, both parties filed motions *in limine* regarding the nature of the nuisance. The City requested that the evidence be limited to damages for a permanent nuisance, damages being measured by the diminution in the fair market value of the property as a result of the nuisance. The plaintiffs requested evidence be limited to damages for a temporary nuisance, where damages are measured by the deprivation of the use, enjoyment, and comforts of the property and the discomfort, aggravation, and annoyance suffered by the property owner. The court denied the City's motion on July 14, 1988, and ordered a trial on the temporary nuisance theory. The court also ruled that the second trial would cover only the time period from May 5, 1978, to May 5, 1983. On July 22, 1988, the individual defendants were dismissed from this action.

The second jury trial began on July 25, 1988. Joseph Tamalunis testified that every time at least .2 of an inch of rain fell or when the sewer system was deliberately blocked at some point, raw sewage flowed onto his property from the overflow. The raw sewage included human excrement, toilet paper, sanitary napkins, and condoms. Joseph also described how the sewer system works and identified nine photographs, later admitted into evidence, which depicted the inside of the outlet sewer at Seminary Street. In dry weather, the 15-inch sewer tile is 90% full. A 24-inch sewer tile serving the north part of Georgetown, added to the system after the original system was constructed, joins the 15-inch tile near the overflow and empties onto Joseph's property at the overflow. Joseph also testified that the odor of sewage from the creek is powerful and often prevents him from doing any yard work when the wind blows from the north.

Marvin Fitzwater, a neighbor of the plaintiffs, also testified, over objection, regarding Seminary Creek and the fact that the water used to be clear and clean and fish were found in the creek as well. By his testimony, it was established that the period when the creek was clean was before 1962. He stated that between 1978 and 1985, the creek on plaintiffs' property was very polluted and "smelled real bad."

Jess Pritchett, director of public works for the City, testified regarding the sewer system and the changes made to the system between 1982 and 1984. The City replaced a jail gate covering the open 54-inch tile exiting from underneath Seminary Street onto plaintiffs' property with a reverse bar screen. The 24-inch sewer tile was modified to prevent sewage from dumping directly into the creek on plaintiffs' property. Most, though not all, of the changes were com-

pleted by the time of the first trial in this case. Pritchett stated no changes were made in the diversion chamber inside the 54-inch tile where the 15-inch tile is joined or to any part of the 54-inch tile underneath Seminary Street. On cross-examination, Pritchett also stated that the City's sewer system is designed to serve 8,000 people and that the sewer treatment plant at Ellis Branch is designed to handle 456,000 gallons of sewage flow in dry weather. In 1984, Pritchett stated that the plant treated approximately 352,000 gallons of sewage on a dry day. He further testified that department employees were instructed by him to manually remove, after each rainfall, any sewage trapped behind the bar screen and take the sewage to the treatment plant. Joseph had previously testified that he observed department employees remove this trapped sewage and deposit it into Seminary Creek on his land.

Betty Tamalunis also testified, over objection, that toilet paper began appearing in the creek in 1964. Betty stated that because of the sewage in the creek, she and Joseph could not plan family get-togethers on the north side of their house. She stated, over defense objection, that she and Joseph were known as the "mean old people" who did not let kids take their sleds down the hill near the creek in the winter. Betty stated she constantly watches for kids playing near the creek and tells them it is not healthy near there. She stated Joseph used to clean the creek by hand but Betty asked him not to because she feared he would contract a disease from the hypodermic needles and prophylactics deposited in the creek.

Dale Francis, a self-employed consulting engineer and land surveyor, testified for the plaintiffs regarding what happens at the overflow when it rains. He stated the diversion chamber, which is where the 15-inch tile joins the 54-inch tile beneath Seminary Street, overflows and water and sludge are deposited into the creek. The sludge, also known as "first flush," is the settlement of the solids from the sewage that settles in the bottom of the sewers during dry weather. Fifty percent of the sludge is human excrement and it has a black color. He stated the bar screen does not prevent all of the sludge from being deposited onto plaintiffs' property, the only real purpose of the bar screen being to prevent animals and people from walking into the open sewer. Francis also described the sewage and sludge shown in various photographs admitted into evidence. He stated sludge does not wash away but builds up on the land. Eventually, sludge decomposes, but Francis estimated decomposition in the creek would take years where in the treatment plant it takes 90 days. Francis estimated that 90 million gallons of combined storm water

and sewage were deposited onto plaintiffs' property between May 1978 and April 1985. On cross-examination, Francis stated that some of the first flush sewage after a rainfall passes to the sewage treatment plant, though most of it is deposited into Seminary Creek on plaintiffs' property.

At the close of plaintiffs' case, the City's motion for directed verdict was denied. The City made an offer of proof for permanent nuisance which was denied. At the close of all the evidence, the City's second motion for a directed verdict was denied.

The jury awarded plaintiffs $150,000 in damages. The City filed its post-trial motion on August 11, 1988. At a hearing held on August 29, 1988, the City's post-trial motion was denied. At this hearing, the City also presented a motion to dismiss count III pursuant to section 2—619(a)(1) of the Civil Practice Law for lack of subject-matter jurisdiction. (Ill. Rev. Stat. 1987, ch. 110, par. 2—619(a)(1).) This motion was also denied. Plaintiffs' motion for permanent injunction was granted on August 31, 1988. The City's motion to vacate the injunction was denied on September 6, 1988. However, on September 6, 1988, the court stayed the enforcement of the injunction pending this appeal.

We first consider the City's issue regarding count I. The trial court concluded that plaintiffs were owners of a strip of land where the sewage is deposited. The City argues that the two prior actions between the City and plaintiffs' predecessors in title, Madden and Goss, established that the City acquired a fee simple interest in the strip of land in 1913 and, therefore, the court erred in granting summary judgment for the plaintiffs. Assuming it acquired only an easement in 1913, the City alternatively argues that the Goss litigation expanded its easement to include the right to discharge, on the surface above the sewer line, overflow from Seminary Street sewer. In the further alternative, the City urges it acquired an easement by prescription for the discharge of overflow onto plaintiffs' land.

Initially, plaintiffs contend the City has waived this argument on appeal because it failed to raise the issue in the first appeal. On the merits, plaintiffs rely on the City's ordinance No. 5, enacted in 1913, which stated the City acquired a fee simple interest in the land where the septic tank (now sewage treatment plant) was located and an easement in the strip of land on plaintiffs' property. Plaintiffs further point out that the 1939 action between the City and Scott Goss and Rosa Goss was settled prior to trial on the issues which are similar to those raised in this action. Moreover, the settlement agreement in the Goss action specifically stated that the parties did not admit

or deny ownership of the strip of land. Plaintiffs argue that the Goss litigation evidences the fact that the City did not have the right to discharge untreated sewage onto plaintiffs' land. Plaintiffs maintain the right to discharge at the overflow is restricted to storm water. Lastly, plaintiffs argue an easement by prescription to discharge untreated, raw sewage is against public policy and equitable principles.

In its reply brief, the City urges it did not waive this issue on appeal because the plaintiffs raised the sole issue presented in the first appeal, which was brought under Rule 306. (107 Ill. 2d R. 306.) The City also urges that the overflow at Seminary Street is never pure, or confined to storm water. Rather, the overflow is an essential design feature of the combined sewer system, which feature gave the City the right to discharge overflow onto plaintiffs' property beginning in 1913. This right is part of its easement on plaintiffs' land, according to the City, and the subsequent Goss litigation established that the overflow at Seminary Street would never be pure but the City would agree only to prevent the discharge from sewage "deemed offensive by the Illinois State Sanitary Water Board" (now the Pollution Control Board).

█▌ Rule 306 allows a party to petition for leave to appeal an order from the circuit court granting a new trial. (107 Ill. 2d R. 306.) An order granting a new trial is interlocutory and the only means to appeal the order is by means of Rule 306. (*Matyskiel v. Bernat* (1967), 85 Ill. App. 2d 175, 179, 228 N.E.2d 746, 749.) The rule also provides that the rulings of the trial court on post-trial motions are before the reviewing court without the necessity of a cross-appeal. (107 Ill. 2d R. 306(a)(2).) At the time the trial court granted plaintiffs' motion for summary judgment on count I, no Rule 304(a) finding was entered. (107 Ill. 2d R. 304(a).) In post-trial motions after the first trial, no issues were raised regarding the court's ruling on count I. While it is arguable whether this issue could have been raised in the first appeal, we determine the City has waived this issue because it failed to preserve this issue in its post-trial motion after the *second* trial. Under Supreme Court Rule 366(b)(2)(iii) (107 Ill. 2d R. 366(b)(2)(iii)), any issue not raised in a post-trial motion is waived on appeal. (*Brown v. Decatur Memorial Hospital* (1980), 83 Ill. 2d 344, 415 N.E.2d 337.) We find this issue is waived.

█▌ We next consider whether the trial court had subject-matter jurisdiction to decide counts II and III of plaintiffs' complaint. The City urges that the trial court lacked subject-matter jurisdiction over counts II and III because of the Act. (Ill. Rev. Stat. 1987, ch. 111½, par. 1001 *et seq.*) The City urges the Act designates the PCB as the

sole entity or judicial body to determine issues related to the discharge of untreated sewage by a municipal sewer system. Specifically, the City urges that plaintiffs' remedy for violation of the law rests with asking the EPA to act. (Ill. Rev. Stat. 1987, ch. 111½, par. 1030.) In turn, the EPA may file a complaint against the City and, thereafter, a hearing would be held before the PCB. (Ill. Rev. Stat. 1987, ch. 111½, par. 1031.) The City maintains the Act preempts the common law action of nuisance.

The City also suggests that the jury in this case was allowed to redefine the standards set for unlawful pollution, in contravention of the stated policies of the Act. The City points out it is discharging sewage within the strictures of its permit issued by the EPA.

Plaintiffs point out and we agree that the Act *expressly* provides that civil and criminal remedies available to persons aggrieved by wrongful actions pertaining to the Act are not excluded or impaired by the Act. (Ill. Rev. Stat. 1987, ch. 111½, par. 1045(a).) The supreme court in the *City of Monmouth v. Pollution Control Board* (1974), 57 Ill. 2d 482, 313 N.E.2d 161, stated that the Act provides remedies which are in addition to those remedies recognized at common law. As to the City's second issue, we find the court had subject-matter jurisdiction to consider plaintiffs' nuisance action.

The City next contends this case involves a permanent, not a temporary, nuisance as found by the trial court. The trial court denied the City's offer of proof for a permanent nuisance where the measure of damages is the diminution in the fair market value of plaintiffs' property. The City's evidence established the damages to be $1,150.

■ As determinative of damages recoverable for injury to property, the law of nuisance recognizes two types of nuisances: temporary or permanent. A permanent nuisance is one characterized as continuing indefinitely and the structure constituting the nuisance is a lawful one, or one which the person or entity has a legal right to maintain. (58 Am. Jur. 2d *Nuisances* §§117, 118 (1971); *O'Brien v. City of O'Fallon* (1980), 80 Ill. App. 3d 841, 846, 400 N.E.2d 456, 459.) In several cases relevant to the issues presented here, Illinois courts have found a sewage treatment plant, an overflow valve in a sanitary sewer system, a sanitary district drainage system, and a dam constructed by a municipality for a waterworks system to constitute permanent nuisances. (*Richards v. Village of Edinburg* (1968), 97 Ill. App. 2d 36, 239 N.E.2d 479; *O'Brien*, 80 Ill. App. 3d 841, 400 N.E.2d 456; *Vette v. Sanitary District* (1913), 260 Ill. 432, 103 N.E. 241; *City of Centralia v. Wright* (1895), 156 Ill. 561, 41 N.E. 217.)

The measure of damages for a permanent nuisance is the depreciation in the market value of the property injured. 58 Am. Jur. 2d *Nuisances* §121 (1971); *O'Brien*, 80 Ill. App. 3d at 845, 400 N.E.2d at 459.

■ A temporary nuisance is one which is occasional, intermittent, or recurrent and is remediable, removable, or abatable. (58 Am. Jur. 2d *Nuisances*, §§117, 118 (1971).) In addition, a nuisance which is caused by the negligent construction of a legal enterprise or the negligent manner of its operation is generally considered temporary. (58 Am. Jur. 2d *Nuisances* §118 (1971).) The Illinois Supreme Court has determined the discharge of untreated sewage and the illegal dumping of refuse to be abatable nuisances. (*Dierks v. Commissioners of Highways* (1892), 142 Ill. 197, 31 N.E. 496; *N.K. Fairbank Co. v. Nicolai* (1897), 167 Ill. 242, 47 N.E. 360.) Generally, the measure of damages for a temporary nuisance is the personal inconvenience, annoyance, and discomfort suffered on account of the nuisance. 58 Am. Jur. 2d *Nuisances* §124 (1971); *Fairbank*, 167 Ill. at 247, 47 N.E. at 361; *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 281 N.E.2d 323.

The City urges the Seminary Street overflow is a permanent nuisance, because it has been in operation continuously for 70 years, and the City intends to continue operating the sewer system. The City relies on *Vette v. Sanitary District* (1913), 260 Ill. 432, 103 N.E. 241, *O'Brien v. City of O'Fallon* (1980), 80 Ill. App. 3d 841, 400 N.E.2d 456, *Richards v. Village of Edinburg* (1968), 97 Ill. App. 2d 36, 239 N.E.2d 479, *City of Centralia v. Wright* (1895), 156 Ill. 561, 41 N.E. 217, and *Strange v. Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* (1910), 245 Ill. 246, 91 N.E. 1036.

As an alternative argument, the City urges that if this case was properly considered a temporary nuisance, a proper damage award is "capped" by the measure of damages for a permanent nuisance. Accordingly, the City requests a remittitur to $1,150. The City cites no authority for this argument.

The plaintiffs contend the dumping of raw sewage is a temporary nuisance. They argue the City's reliance on the above-cited cases is misplaced. Plaintiffs also state that a landowner complaining of a nuisance has the *option* of treating the nuisance as a temporary or permanent nuisance and cite *Strange* in support of this argument.

Except for the *O'Brien* case, none of the cases relied upon by the City involve a municipal sewer system or the discharge of raw, untreated sewage. In *O'Brien*, plaintiffs brought a nuisance action for contamination of a private lake by raw sewage from a municipal

sanitary sewer system. The City installed an "overflow valve" in the sewer line to relieve pressure in the sewer lines during periods of heavy rainfall. When the valve was open, raw sewage was discharged into a ditch and eventually dumped into plaintiffs' lake. At the time the valve was installed, the area near the lake was undeveloped land. After many complaints from the plaintiffs, the original valve was replaced with a manually operated valve. This new valve and other changes to the system reduced the time when the valve was opened during heavy rainfall. Thus, the amount of sewage in plaintiffs' lake diminished. However, it was not eliminated.

The plaintiff in *O'Brien* sought damages for a permanent nuisance. On appeal, the defendant city argued the plaintiff offered no evidence to establish the nuisance was permanent. The court found that even though under the general rule, the overflow valve would be considered a temporary nuisance because it was unlawful due to its operation in violation of EPA rules and regulations, application of the general rule to the case was contraindicated. The court noted that the evidence established the City intended to continue to operate the overflow valve, while engaging in various measures to reduce or halt the dependency on the valve. The *O'Brien* court also noted there were no prospects for removal or abatement of the nuisance, though legal action to remove or abate had been taken.

The *O'Brien* case is not in accord with an Illinois Supreme Court case, *N.K. Fairbank Co. v. Nicolai* (1897), 167 Ill. 242, 47 N.E. 360. In that case, a landowner filed an action for nuisance against a nearby landowner for the maintenance of foul smelling barrels on his property and the dumping of refuse into the street. The plaintiff sought damages for depreciation in the value of his property (permanent nuisance) and damages for the injury to the rental value of his property (temporary nuisance). The supreme court found permanent nuisance damages could not be recovered for "nuisances which may be removed at any time or abated at the instance of a party aggrieved thereby." *Fairbank Co.*, 167 Ill. at 246, 47 N.E. at 361.

In another case, *Dierks v. Commissioners of Highways* (1892), 142 Ill. 197, 31 N.E. 496, the supreme court found the discharge of sewage was an abatable nuisance. In *Dierks*, a landowner sought only an injunction to abate a nuisance caused by the drainage of raw sewage onto her property. The court found that the evidence established that the "continuance [of the sewage discharge] will be detrimental to the comfort, the health and lives of those who reside in the immediate locality, and it ought to be abated." *Dierks*, 142 Ill. at 213, 31 N.E. at 501.

■ We conclude the discharge of untreated raw sewage is a temporary nuisance. While the City may have the right to operate the combined sewer system, the untreated sewage involved in this case defies any conceivable suggestion that its discharge at the overflow is within current legal guidelines. The City maintains it is discharging pursuant to a valid EPA permit. However, the evidence is to the contrary.

The City's permit states that the overflow at Seminary Street is permitted provided it conforms to the following:

"Required effluent limitations for combined sewers and treatment plant bypasses shall conform with 35 Illinois Administrative Code 306.103(c)."

Section 306.103(c), now section 306.305(c) (35 Ill. Adm. Code §306.305(c), at 3543 (1985)), requires that discharged water must be *treated* "to the extent necessary to prevent accumulations of sludge deposits, floating debris and solids in accordance with 35 Illinois Administrative Code 302.203." (Emphasis added.) Section 302.203 provides:

"Unnatural Sludge

Waters of the State shall be free from unnatural sludge or bottom deposits, floating debris, visible oil, odor, unnatural plant or algal growth, unnatural color or turbidity, or matter of other than natural origin in concentrations or combinations toxic or harmful to human, animal, plant, or aquatic life." (35 Ill. Adm. Code §302.203, at 3506 (1985).)

Plaintiffs' evidence clearly established that the overflow discharge is not treated and the creek is polluted.

We have considered the *O'Brien* case cited by the City. Admittedly, it is factually similar to the case before us. There, however, the landowner sued for a permanent nuisance and the court recognized the facts to involve a temporary nuisance. In affirming a finding that a permanent nuisance was involved, the *O'Brien* court focused on the defendant city's intent to continue operating the illegal structure. We decline to adopt the Fifth District Appellate Court's analysis in *O'Brien*. In our view, an otherwise lawful structure, such as the municipal sewer system in this case, becomes unlawful when the manner of its operation exceeds the guidelines established for its legal operation. The intent of the owners of such a structure to continue the method of operation is not the proper focal point and cannot negate the fact that the structure is illegally operated. The trial court's finding of temporary nuisance is affirmed.

■ The City next maintains the trial court abused its discretion

in denying the City's leave to file an amended answer before the beginning of the second trial. It is within the sound discretion of the trial court to permit or refuse an amendment to pleadings at any time before final judgment and its decision will not be disturbed on review absent an abuse of discretion. (*American Pharmaseal v. TEC Systems* (1987), 162 Ill. App. 3d 351, 515 N.E.2d 432; *DiBenedetto v. County of Du Page* (1986), 141 Ill. App. 3d 675, 491 N.E.2d 13.) The test of whether the court's discretion has been properly exercised is whether the amendment furthers the ends of justice. (*Bowman v. County of Lake* (1963), 29 Ill. 2d 268, 281, 193 N.E.2d 833, 840.) Other factors to consider in evaluating the court's exercise of discretion include the timeliness of the proposed amendment and whether the other party is prejudiced or surprised by the amendment. (*DiBenedetto*, 141 Ill. App. 3d at 681, 491 N.E.2d at 18; *American Pharmaseal*, 162 Ill. App. 3d at 360, 515 N.E.2d at 437.) In *Cvengros v. Liquid Carbonic Corp.* (1981), 99 Ill. App. 3d 376, 425 N.E.2d 1050, the court noted leave to file an amendment to a complaint should not be denied on the sole basis that it is not timely.

■ The plaintiffs urge the City has waived this issue because it did not raise the liability issue in the first appeal. We agree. After the first trial, the trial court ordered a new trial on damages alone. The issue of the City's liability was properly an issue before review in this court in the first appeal. (*Kazubowski v. Kazubowski* (1970), 45 Ill. 2d 405, 259 N.E.2d 282.) The City did not argue or raise this issue then but sought to reopen the liability issue by seeking leave to amend its pleadings. We decline to address this issue on waiver principles.

The City next claims various evidentiary rulings during the second trial as well as the conduct of plaintiff's trial counsel deprived it of a fair trial. Specifically, the City urges (1) various photographs, exhibit Nos. 55 through 62, admitted into evidence over defense objection were prejudicial to the City; (2) exhibit Nos. 31 through 39, depicting the inner chambers of the sewer system, were irrelevant; (3) testimony regarding the condition of the creek prior to 1978 should not have been admitted and was prejudicial to the City; (4) testimony regarding the "humiliation" or "embarrassment" suffered by the plaintiffs is not a proper element of nuisance damages; and (5) testimony regarding plaintiffs' cost to protect their property from the sewage was irrelevant.

Regarding exhibit Nos. 55 through 62, these exhibits are not part of the record on appeal, and therefore, the City has waived this issue under Supreme Court Rule 323. (107 Ill. 2d R. 323.) As to exhibit

Nos. 31 through 39, the testimony regarding the condition of the creek prior to 1978 and the testimony regarding plaintiffs' costs of protecting their property, the City has waived these issues for failure to cite authority for its arguments. 107 Ill. 2d R. 341(e)(7); *People ex rel. Daley v. Warren Motors, Inc.* (1986), 114 Ill. 2d 305, 321, 500 N.E.2d 22, 29.

■ Regarding the elements considered for temporary nuisance elements damages, the City argues the testimony concerning the plaintiffs' "humiliation" and "embarrassment" is subjective and, therefore, improper because temporary nuisance damages are based on objective standards.

As the City points out, the trial court ruled that plaintiffs could not recover separately for humiliation or embarrassment but the jury could consider these feelings in regard to the annoyance plaintiffs suffered because of the sewage. The City raises no issues on the jury instructions. The instructions to the jury on the elements of plaintiffs' damages were "deprivation of the use, enjoyment, and comforts of the property and the annoyance to them."

The City claims the testimony was prejudicial but does not point out how it was so, other than to suggest that Betty's testimony led the jury to award damages for imaginary injuries or that Betty was a person of delicate sensibilities. The record does not establish that the plaintiffs' humiliation and embarrassment were separately considered so as to influence the amount of the damage award. We find no error.

The City also contends the conduct of plaintiffs' trial counsel deprived it of a fair trial. Specifically, the City claims prejudice by:

(1) The introduction of evidence regarding events after 1985.

(2) The final arguments of plaintiffs' counsel where the City's actions were characterized as "illegal"; where the counsel attempted to make a *per diem* argument for damages; where counsel argued embarrassment.

(3) *Voir dire* statements when counsel referred to insurance and asked a prospective juror to put herself in plaintiffs' shoes.

(4) Opening statements when counsel twice made statements which would not be provable by the evidence.

The City claims the cumulative effect of the inflammatory and prejudicial evidence resulted in a jury prejudiced against the City and in sympathy with the plaintiffs.

The record reflects that the City's objections to *voir dire* statements, openings statements, introduction of evidence occurring after

1985, closing argument remarks referring to "illegal," and a *per diem* argument were sustained by the trial court.

■ Generally, in matters involving arguments or remarks of counsel, the question of prejudicial impact, if any, upon the jury is within the sound discretion of the trial court and will not be disturbed on review unless there has been a clear abuse of discretion. (*Zelinski v. Security Lumber Co.* (1985), 133 Ill. App. 3d 927, 479 N.E.2d 1091.) Here, the trial court denied the City's post-trial motion and expressly found plaintiffs' counsel's actions were not deliberate in the sense of misleading the jury but rather were attributable to counsel's "overzealousness."

■ The record establishes that the trial court advised the jury to disregard improper comments of counsel during *voir dire* and admonished the jury that opening statements and closing arguments do not constitute evidence for jury consideration. In addition, the jury was properly instructed on the time frame involved in this case. We find no abuse of discretion in the trial court's rulings.

Finally, the City maintains the issuance of the permanent injunction against the discharge of any sludge, sewage, or toilet waste at the Seminary Street overflow was error. Specifically, the City contends the trial court should have balanced the benefits to the plaintiffs with the financial burden on the City to comply with the injunction. Plaintiffs urge they have a right to have the nuisance abated, notwithstanding the burden on the City. Plaintiffs rely on *Calhoon v. Communications Systems Construction, Inc.* (1986), 140 Ill. App. 3d 1012, 489 N.E.2d 23, and *Ruth v. Aurora Sanitary District* (1959), 17 Ill. 2d 11, 158 N.E.2d 601.

■ The granting of an injunction is a matter of discretion for a circuit court. (*Statler v. Catalano* (1988), 167 Ill. App. 3d 397, 411, 521 N.E.2d 565, 575.) A reviewing court will only look to whether the circuit court properly exercised its broad discretionary powers when it granted injunctive relief and will only overturn a circuit court's ruling where there has been a manifest abuse of discretion. *Statler*, 167 Ill. App. 3d at 411, 521 N.E.2d at 575.

■ An injunction is an extraordinary remedy which is only granted after the plaintiff establishes the existence of a lawful right, irreparable harm, and an inadequate remedy at law. (*Wilson v. Illinois Benedictine College* (1983), 112 Ill. App. 3d 932, 937, 445 N.E.2d 901, 906.) The right sought to be protected must be certain and clearly ascertainable. (*Wilson*, 112 Ill. App. 3d at 937, 445 N.E.2d at 906.) The standard for the adequacy of the legal remedy is whether it is clear, complete, and as practical and efficient as the

equitable remedy. (*Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 549, 370 N.E.2d 223, 227.) Irreparable harm does not mean injury that is beyond repair or beyond compensation in damages but rather denotes transgressions of a continuing nature. *SSA Foods, Inc. v. Giannotti* (1982), 105 Ill. App. 3d 424, 428, 434 N.E.2d 460, 463-64.

Plaintiffs established the discharge of sewage onto their property substantially interferes with the enjoyment of their property. Plaintiffs have proved a lawful right and irreparable harm due to the continuing nature of the sewage discharges. Whether this irreparable harm has been adequately remedied by the award of $150,000 damages is the remaining question.

Plaintiffs' argument that the mere existence of the nuisance in this case affords them injunctive relief against the nuisance is not tenable. Equity will not, as a matter of course, order relief in nuisance cases until all the circumstances and consequences of such action are considered. (*Haack v. Lindsay Light & Chemical Co.* (1946), 393 Ill. 367, 373, 66 N.E.2d 391, 394.) Plaintiffs' reliance on *Calhoon*, a case involving an encroachment on private property by cable television transmission lines, is misplaced and we do not view *Calhoon* as dispositive of this issue.

We conclude the damage award adequately remedies the nuisance found in this case, and therefore, we reverse the injunction. Our decision is not meant to reflect our belief that the nuisance is not remediable and should not be abated by the City. On the contrary, plaintiffs may seek and qualify for equitable relief in the future in a separate action should the discharge of sewage at the Seminary Street overflow continue, as in the past, unabated. *Haack*, 393 Ill. 367, 66 N.E.2d 391.

To summarize, we affirm the trial court's decision in count I of the complaint and the trial court's determination that this case involves a temporary nuisance. We find no error in the evidentiary and pretrial rulings of the trial court and conclude that the City was not prejudiced by the conduct of plaintiffs' counsel. We reverse the order for injunctive relief.

Affirmed in part; reversed in part.

KNECHT and SPITZ, JJ., concur.