ROBERT F. O'BRIEN *et al.*, Plaintiffs-Appellees, *v.* THE CITY OF O'FALLON, Defendant-Appellant.

Fifth District   No. 79-122

Opinion filed January 10, 1980.

Jack Carey and Jeanne Sathre, both of Cohn, Carr, Korein, Kunin, Schlichter and Brennan, of East St. Louis, for appellees.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

Defendant city appeals a judgment entered upon a jury verdict for $30,000 in an action for nuisance brought by plaintiffs-homeowners. Plaintiffs' action was founded upon contamination of a private lake by raw sewage from defendant's sanitary sewer system purposefully discharged by defendant's employees.

Defendant presents two issues for review: "* * * whether the Trial Court erred in allowing the jury to consider diminished market value of the plaintiffs' property as an element of damage," and "* * * whether the trial court erred in granting the plaintiffs' Motion in Limine thereby denying the defendant the right to present evidence as to the reasonableness of its conduct." We affirm.

In 1961 the defendant city installed an "overflow valve" in a sanitary sewer line, the origin of the problem giving rise to this lawsuit. The purpose of the valve was to relieve pressure in the line during episodes of heavy or persistent rainfall. The pressure apparently resulted from infiltration of surface or other unanticipated waters into the system. By opening the valve during periods of heavy rainfall pressure in the system was relieved, but raw sewage was then discharged into a ditch and thence into plaintiffs' lake which is downgrade from the valve.

At the time the valve was originally installed the lake was located on undeveloped land. However, in time the area was developed as residential. In 1969 plaintiffs purchased about half of the lake and two adjacent lots, choosing the site in part for the recreational value of the

lake. It was said that the developer represented at the time that the waters of the lake were purer than drinking water. At a cost of between $60,000 and $65,000 plaintiffs built what was described throughout the trial as a luxury type home. Construction began in June 1969 and plaintiffs and their eight children moved into the home in December.

Occasionally during the summer of 1970 plaintiffs became aware of foul odors emanating from the lake. With passing time the odor grew worse and the presence of human waste in the lake waters became unmistakable. Eventually plaintiffs discovered that the cause of the odors and the presence of human waste was the defendant's sewage system overflow valve located about a block and a half distant.

In warmer weather plaintiffs found themselves generally unable to enjoy their property whenever they were indoors with the windows open or outdoors. They were, of course, unable to swim or fish in the lake, although when a freeze would occur they could ice skate on it. Plaintiffs noticed that the lake was rapidly silting in and that a dense growth of grasses was filling in its shallow end. The addition of chemicals to the lake to purify it was of no avail.

In 1971 or 1972 plaintiffs made the first of what was to become a long series of complaints to the defendant city. After a substantial fish kill in the lake, they made the first of what was also to become a long series of complaints to the Illinois Environmental Protection Agency (hereinafter referred to as EPA). After an investigation by the EPA in which test results indicated the presence of raw sewage in plaintiffs' lake, the EPA declared the city in violation of Illinois Pollution Control Board Rules and Regulations, chapter 3, Rule 602(b), prohibiting overflows from sanitary sewers. In or about 1974 the EPA ordered the overflow valve immediately closed. It was not.

In 1975 the city installed a manually operated overflow valve to replace the valve which had been installed in 1961. Rising waters had merely spilled out of the old valve as overflow but by the use of the new valve the discharge of overflow waters could be controlled. The city could determine precisely when and for how long the valve should be opened to allow the escape into plaintiffs' lake of sewage water which would otherwise inundate basements and lower living levels of some dwellings on the sewer line, as had happened on prior occasions. In addition to changing the valve the city attempted to determine the sources of infiltrating waters. By eliminating some of the means whereby nonrefuse water could infiltrate the sewers, the city was able to reduce the amount of water encroaching and thus the amount of time the manually operated valve had to remain open during times of heavy rainfall. The "open" time was reduced to somewhere between one-sixth and one-twelfth of what it was before some of the sources of infiltration were

detected. Whereas formerly the valve might normally have been left open for 24 hours (and 72 hours was apparently not unusual), following the diminution of infiltrating waters it had to be left open for from two hours to as little as 30 minutes. The city has thus been successful in diminishing the amount of sewage which is deposited in plaintiffs' lake but has not eliminated completely the intermittent discharge of waste.

The city's engineer testified that, given the difficulty of the task of finding the sources of infiltration in a system like the city of O'Fallon's and the attendant cost, he knew of no time in the future when he could say with certainty that the city would no longer discharge waste into plaintiffs' lake. He indicated that he would not want to testify under oath that the overflow will be eliminated by the year 2001.

The city remains in violation of law. During one occasion of heavy rainfall with sewage backups into homes along the sewer line, the EPA expressly stated that it could not approve the operation of the overflow valve. There is no indication in the record that the city has applied to the Pollution Control Board for a variance as was once suggested by the EPA in correspondence with the city. The city was there advised that if it believed that compliance would impose an arbitrary and unreasonable hardship upon it, it could so apply. There was, of course, no indication whether a variance would have been granted.

Prior to trial both parties filed motions *in limine.* Plaintiffs asked in their motion, which was subsequently granted, that defendant not be permitted to introduce any evidence of its reasons for diverting the sewage into the lake. Defendant asked in its motion, which was subsequently denied, that plaintiffs not be permitted to put on evidence through their appraiser of the diminution of the market value of their property.

At trial both parties called appraisers as experts to testify to the value of plaintiffs' property. Plaintiffs' appraiser testified that after complete inspection of the property in 1977 he determined that without the presence of foul odors from the lake its fair market value would then have been $130,000. He found that as a result of the odors the value of the property was diminished by $20,000 so that its market value in 1977 was $110,000. He further testified that in 1971 the market value of the property without diminution of value as a result of the odors would have been between $80,000 and $85,000.

Defendant's appraiser, on the other hand, found that the value of plaintiffs' property was in no way diminished by the presence of the odors. After having inspected the exterior of the residence with some glancing in windows the evening before trial, he testified that the property was worth $113,000.

Throughout trial defendant objected to diminution in value as a

measure of damages, usually for the reason that the first valve installed by the city was operating prior to plaintiffs' purchase of the property and that a diminution of value may have been reflected in the original purchase price although plaintiffs might have had no knowledge of the existence of the valve at the time they purchased the property. It objected to the instruction for damages measured by diminution in value on the ground that it was not supported by the evidence. That also was the ground of its objection in the post-trial motion for a new trial or for entry of judgment notwithstanding the verdict. Defendant made no objection to diminution in value as a measure of damages upon the basis that the nuisance was not permanent.

Neither at the trial nor in its appeal did the defendant city argue that a nuisance had not been created by the installation and use of the sewage overflow valve. We therefore need not concern ourselves with determining whether a nuisance was created by defendant as defined and discussed in Restatement (Second) of Torts §822 through 826 (1979).) We will limit our discussion to those issues raised and discussed by the defendant in its brief.

The first argument defendant presents on appeal is that the trial court committed error when it allowed the jury to consider diminution in value of plaintiffs' property as an element of damages. The answer to the argument turns on whether the nuisance in question is permanent or temporary. Defendant contends the plaintiffs offered no evidence to show the nuisance is permanent.

■■ As this court said in *Richards v. Village of Edinburg* (1968), 97 Ill. App. 2d 36, 239 N.E.2d 479, the correct measure of damages for a permanent nuisance is the depreciation in market value of the property affected by the nuisance. By contrast, damages for a temporary nuisance, where the owner has resided on the property during the period when it was damaged by a nuisance, are measured by the owner's discomfort and the deprivation of the healthful use and comforts of his home. *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 281 N.E.2d 323; *Racine v. Catholic Bishop of Chicago* (1937), 290 Ill. App. 284, 8 N.E.2d 210.

As for defining a nuisance as permanent or temporary, in *Richards*, which involved the operation of a sewage plant emitting foul odors to the distress of neighboring homeowner plaintiffs, we also said:

> " 'A temporary nuisance is one which is abatable, while a permanent nuisance is one which, despite lack of negligence in the construction or operation of the plant, may be expected to continue. To be permanent, it would seem necessary that it appear that there exists a legal right to maintain the sewage disposal plant although its operation must necessarily result in a nuisance.' " 97 Ill. App. 2d 36, 41, 239 N.E.2d 479, 482.

■ We recognize that it has become an axiom of Illinois nuisance law that, in order to be considered permanent, a structure (which constitutes or causes a nuisance) must be lawful, for where such structure is unlawful a presumption arises that the force of law will be brought to bear so as to eradicate the illegality. As a consequence a nuisance stemming from an unlawful structure is deemed to be temporary. (*Ramey v. Baltimore & Ohio Southwestern Ry. Co.* (1908), 235 Ill. 502, 85 N.E. 639; *Sanitary District v. Ray* (1902), 199 Ill. 63, 64 N.E. 1048; *Richards v. Village of Edinburg*; *Kugel v. Village of Brookfield* (1944), 322 Ill. App. 349, 54 N.E.2d 92; McCormick, Handbook on the Law of Damages §127 (1935).) Since the structure involved in the creation of the nuisance in this case (the sewage overflow valve) is conceded to be illegal, should not the general rule be applied and the nuisance be presumed temporary? We believe not. Factors present in this case show the application of the general rule to be contraindicated, and the ruling of the trial court that the nuisance was permanent should be affirmed.

■ Lawful structures which constitute or cause a nuisance are regarded as permanent despite the fact that the resultant nuisance is abatable. The notion of permanency of such structures is derived from the intention of their owners to continue their use or operation despite the fact that they are productive of a nuisance. (*Strange v. Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* (1910), 245 Ill. 246, 91 N.E. 1036; *Ohio & Mississippi Ry. Co. v. Thillman* (1892), 143 Ill. 127, 32 N.E. 529; *Richards v. Village of Edinburg*; *Farrow v. Eldred Drainage & Levee Dist.* (1932), 268 Ill. App. 432.) In the *Strange* case the supreme court stated:

> "The road was completed two years before the suit was brought and has since that time been operated in the condition it was in when the construction was completed. If appellant considered and intended its structure as completed to be permanent, we see no reason why appellee might not also treat it as permanent." 245 Ill. 246, 250.

Although the overflow valve considered here is unlawful, and has been so declared by the EPA as violative of its rules and regulations pertaining to the discharge of raw sewage, the intent to continue to maintain and operate the illegal structure is present. Such intent is manifest from the defendant's continued use of it and from the express declaration of city employees that they will continue its use. The defendant's brief outlined (from the evidence) the measures the city planned to follow to reduce or halt its dependency on the illegal overflow valve. These measures included an inflow-outflow analysis of the entire sewer system and using flow gauges and metering devices within various segments of the sewers for fairly long periods of time. It intended to

attempt to establish what a normal flow was during dry weather conditions as opposed to the flow during wet weather periods. Finally, the city planned to pinpoint the areas where the water was coming from. However, it is plain from the record that future use of the valve had not been foreclosed and that the solution to the problem lay somewhere in the future. In concluding his testimony on direct, the city engineer testified, when asked if the problem could be eliminated:

> "Oh, yes, I think it can be eliminated. It's going to take a period of time in order to be able to do this. Then also, the City is going to have to be able to raise the necessary funds in order to accomplsish the task."

On cross-examination the engineer indicated he would not want to say the problem would be eliminated by the year 2001.

■■ In ruling on defendant's motion in limine the trial court remarked:

> "* * * in any event, it appears it will probably be too expensive to either replace or repair the sewers, particularly in light of the fact they don't know where the problems are coming from.
>
> From all of that, it would appear that this nuisance would then be classified a permanent one. If that be the case, then the measure of damages is the difference in the fair market value * * *."

With no prospects for removal or abatement, though the legal action to remove or abate has been taken, we believe the trial court was correct in terming the overflow valve, and its attendant nuisance, permanent.

We would observe here that we are not dealing with what is to be considered permanent in a philosophical sense—we are considering a component in a sewer system and a house. The overflow valve has now been in place for approximately 18 years. Under the circumstances presented here we think it reasonable to consider it to be of the same degree of permanency as the plaintiffs' house which it debases.

As an ancillary argument to that in which it questions the permanency of the nuisance, the defendant city contends that plaintiffs' proof of damages to their property was incorrect, and that contention rests on two grounds. First, the overflow valve was in place before plaintiffs purchased the lake and lots and built their house, consequently the property was already debased in value when it was acquired and plaintiffs are being permitted a double recovery; second, the appraiser for plaintiffs who testified as to the diminution in value used an erroneous and prejudicial basis for his testimony.

■■ Defendant's first contention is unavailing. Although the overflow valve was in place and functioning well before plaintiffs acquired their lots and built their house, the nuisance produced had not made itself manifest at the time. There is absolutely no evidence or indication to the

contrary. At the time the valve was first installed the area was largely undeveloped, a factor which would militate against awareness of any problem. Too, the odors and fecal pollution have been intermittently spawned, obviously varying in intensity and duration with weather conditions and the degree of legitimate discharge into the sewer system. It is understandable that plaintiffs could purchase their lots and build their house with no prior knowledge or indication of any kind that they were to be subsequently subjected to discomfort and damage from having raw sewage cast upon their property. Not only did they not know of the problem, there is nothing to suggest that they should have or could have known. As purchasers of building lots within a city limits, they were entitled to expect that raw sewage would be kept in the sewers. Defendant has produced no evidence whatsoever that would show the value of the property was debased by the nuisance prior to the time plaintiffs purchased it. As we have discussed above, all indications are to the contrary. Accordingly, the plaintiffs are entitled to damages based upon the full value of their property.

With regard to the second contention, defendant argues, correctly, that the usual method of proving tortious damage to real estate is to show the fair market value just before an occurrence and the fair market value immediately after an occurrence. (*Arras v. Columbia Quarry Co.* (1977), 52 Ill. App. 3d 560; *Kugel v. Village of Brookfield*.) However, strict application of the rule does not lend itself to easy application in this case. It would be all but impossible to fix the onset of the "occurrence" that gave rise to the damage. The lots were purchased, the house was built, some odors were later noticed; still later the odors became oppressive and the presence of human waste was noticed in the waters of the lake.

The plaintiffs' appraiser examined the property in 1977 prior to trial. He testified that when his appraisal was made in 1977 he saw a little lake on one side of the grounds and noticed foul odors emanating from it. He placed the fair market value of the home in 1971 as $80,000 to $85,000. He further testified that the value in 1977 was $130,000, but because of the smell the value was diminished by $20,000, leaving a fair market value of $110,000.

■■ In the circumstances of this case we think the plaintiffs' proof of damages furnished sufficient indicia upon which the jury could properly base its findings. The value of the house was established for 1971 and the inflation and market enhanced value was then established for 1977. This amount was then debased by the detriment to the value which resulted from the nuisance. This method, while not strictly within customary guidelines, was closely akin to it, and where the date of onset of the nuisance was vague, we think it acceptable. The method of measurement

of damages followed by plaintiffs' appraiser in this case was approved by the court in *Stirs, Inc. v. City of Chicago* (1974), 24 Ill. App. 3d 118, 320 N.E.2d 216. We note, too, that after defendant's motion in limine was denied, its appraiser followed the same course as plaintiffs' appraiser, testifying that there was *no* diminution in value by reason of the odors.

Defendant finally contends that the trial court erred in granting plaintiffs' motion *in limine* denying it the right to present evidence as to the reasonableness of its conduct. The argument is that prejudice ensued when it was

> "\* \* \* not allowed to introduce any evidence concerning the consequences of closing the overflow valve which allowed sewage to be deposited into the lake abuting the plaintiffs' property. The reason for the installation of the overflow and its continued use was that without it, sewage would back up through basements and lower living levels of property owners served by the Madison Street sewer. The conduct of the defendant in the instant case was prompted by a desire to temporarily solve the problem of other residents of O'Fallon."

By its argument defendant seeks to invoke a well-established principle of nuisance law. Defendant quotes the following from Prosser, Law of Torts §88, at 602 (3d ed. 1964) as a statement of the principle:

> "Each defendant is privileged, within reasonable limits, to make use of his own property or to conduct his own affairs at the expense of some harm to his neighbors. He may operate a factory whose noise and smoke cause some discomfort to others, so long as he keeps within reasonable bounds. It is only when his conduct is unreasonable, in the light of its utility and the harm which results, that it becomes a nuisance. This privilege, which is broader, more indefinite and more comprehensive than the specific privileges to interfere with the bodily security of another, usually is expressed by saying that there is no liability for nuisance unless the defendant's conduct is unreasonable under the circumstances."

This is undoubtedly a correct statement of the law, and it is followed in Illinois. *Gardner v. International Shoe Co.* (1944), 386 Ill. 418, 54 N.E.2d 482; *Wheat v. Freeman Coal Mining Corp.* (1974), 23 Ill. App. 3d 14, 319 N.E.2d 290; *Patterson v. Peabody Coal Co.* (1954), 3 Ill. App. 2d 311, 122 N.E.2d 48. Also see Restatement (Second) of Torts §§826 and 827 (1979). ■■ However, the defendant's endeavor to invoke the rule which balances the gravity of the harm against the utility of the conduct is untenable in this case. The reason is simple. It seeks to invoke the rule in order to justify or alleviate the consequences of its deliberate violation of

850

EPA rules and regulations regarding the disposition of raw sewage. That damage to plaintiffs' property may be the lesser of two evils cannot serve to lessen defendant's liability for the reason that violation of the law cannot be considered reasonable conduct.

Affirmed.

KARNS and HARRISON, JJ., concur.