The **TOWN OF SUPERIOR, MONTANA, a municipality, Mineral County, a body politic, and Superior School District No. 3, Plaintiffs,**

v.

**ASARCO, INCORPORATED, a foreign Corporation, Defendant.**

**No. CV 01–147–M–DWM.**

United States District Court, D. Montana, Missoula Division.

Sept. 27, 2004.

A. Clifford Edwards, Roger W. Frickle, Edwards Frickle & Culver, Roberta L. Anner–Hughes, Anner–Hughes Law Firm, Billings, MT, for Plaintiffs.

## ORDER

DONALD W. MOLLOY, Chief Judge.

## I. INTRODUCTION

The Town of Superior, Mineral County, and the Superior School District allege three claims for each of two distinct factual scenarios. They allege nuisance/trespass, negligence, and violation of the right to a clean and healthful environment under the Montana Constitution for high levels of antimony in Flat Creek spring, which was Superior's primary drinking water supply until the contamination was discovered in 1997, and for contaminated tailings that

were taken from the Iron Mill site, trucked into Superior and used as underlay for roads, driveways, and the track at Superior High School. The Town purchased the Superior water system, which includes the Flat Creek spring, from Mountain Water Company in 2000.

The majority of Plaintiffs' trespass/nuisance allegations are directed at the contamination of Flat Creek spring; however, the last paragraph of that count alleges that Defendants allowed and encouraged the Plaintiffs "to take and use" the tailings throughout the town and the county, thereby creating a nuisance for which Defendants are liable. Am. Complt. ¶ 26. The negligence claim is directed at both the contamination of the spring and the Defendants' "allowing and encouraging the citizens of the Town of Superior, the County, and the School District to take and use the hazardous tailings throughout their communities." Am. Complt. ¶ 29.[1] Finally, Plaintiffs allege that Defendants violated the Plaintiffs' right to a clean and healthful environment based upon the acts and omissions described above. Am. Complt. ¶ 30.

In their prayer for relief, Plaintiffs request compensatory and punitive damages. They do not request injunctive relief.

Defendants have moved for summary judgment on the grounds that: 1) Plaintiffs have not suffered any compensatory damages, and 2) Plaintiffs' claims are barred by statutes of limitation. Plaintiffs filed their original complaint on August 21, 2001.

The parties have briefed the motions. I find that there are no material facts in dispute, and that Asarco is entitled to judgment as a matter of law on Plaintiffs' negligence and nuisance/trespass claims arising from the contamination of Flat Creek spring. I find there are material issues of fact preventing judgment on Plaintiffs' negligence and nuisance/trespass claims arising from the tailings contamination, and am therefore denying summary judgment on those claims.

Plaintiffs' final claim is that the contamination of the spring and the use of contaminated tailings gives rise to a constitutional tort. The Montana Supreme Court has never recognized the existence of a tort based upon the right to a clean and healthful environment in the Montana constitution. Because this is an issue unique to Montana law, I am certifying questions regarding that claim to the Montana Supreme Court in a separate order.

## II. SUMMARY JUDGMENT STANDARDS

Summary judgment is proper if the movant demonstrates there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). In applying this standard, all reasonable inferences must be drawn from the factual record in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim. *Id.* Because the Court sits in diversity jurisdiction, the substantive law of the forum state applies. *Erie R.R. Co. v. Tompkins,*

---

**1.** Plaintiffs later modified that claim, during 30(b)(6) depositions, to allege that Asarco did not actively discourage Plaintiffs and town residents from taking tailings from the Iron Mountain Mine site. Defendants' Statement of Uncontroverted Facts ¶ 21.

304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Montana law therefore governs.

The party moving for summary judgment bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this has been achieved, the burden shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue of fact does exist. Fed.R.Civ.P. 56(e).

## III. FLAT CREEK SPRING

The Town of Superior purchased the right to the Flat Creek spring water when it purchased the water system from Mountain Water Company in 2000. Although there is passing reference to a record from DNRC showing the Town having a water right in the spring as of 1890, the sale documents for the water system in 2000 clearly show that Mountain Water Company conveyed a water right in the Flat Creek Spring for 400 miner's inches to the Town. Montana Power previously owned those rights and conveyed them to Mountain Water in 1980.

When the Town bought the water system the spring had already been taken out of production for drinking water, although it remains available for fire protection. The three wells currently serving the Town were conveyed from Montana Power to Mountain Water in 1979, and were converted to the primary drinking water source in 1997 by Mountain Water. All of the capital improvements referred to in the Complaint were developed by Mountain Water, and paid for by the Town when it bought the water system.

MSE–HKM, Inc., a consultant hired by the Town prior to the purchase of the water system, described Superior's water system in a plan it prepared to assist the Town in deciding whether to buy the system from Mountain Water, and for how much:

> Until the mid–1990's, the Superior water system had a dual source of water supply. According to company produced documents, the source of first choice was an underground collection gallery in the Flat Creek drainage, and the secondary source were three wells located on the south side of the river on the valley floor. The first source collected water by means of a buried perforated pipe and the water collected at this point was transported via pipe to a screening chamber, then to a 25,000 gallon storage tank, and from there to the Town, That system involved no pumping whatsoever and provided a variable amount of water to its customers throughout the entire year . . .
>
> . . . In order to improve the efficiency of the system, MWC has extensively upgraded the distribution system in recent years, which resulted in substantial rate increases to consumers.

Exh. P, Facility Plan, at 5–1.

During routine testing required by the EPA in September 1997, Mountain Water Company learned that the level of antimony in the Flat Creek spring was .31 milligrams per liter, which exceeded the maximum contaminant level (MCL). Defendants' Exhibit I (lab report); Hiller Depo. 57:3–58:16. As soon as Mountain Water learned of the high antimony, it discontinued Flat Creek as a source of water for Superior. Hiller Depo. 58:17–23. Mountain Water notified the Town of Superior of the high antimony levels. Hiller Depo. 58:24–59:1.

Mountain Water did not acquire or develop new sources of water in response to the elevated antimony; it switched over to the existing well system entirely. Hiller Depo. 83:24–84:10. However, the costs of

using the wells is higher than the cost of using the spring because the well water has to be pumped uphill. Hiller Depo. 158:11–17. Mountain Water hoped to find a way to remediate the antimony contamination and bring the spring back as a primary water source for Superior. Hiller Depo. 158:25–159:12.

In April 1998, Mountain Water approached the town of Superior about selling the water system to the town. Defendants' Exhibit J (Minutes, Town Council meeting, Apr. 13, 1998); Hiller Depo. 94:15–96:19. It did this because it had recently raised water rates significantly, and was preparing to request permission from the Public Service Commission to raise them again, 65–75 percent. Mountain Water estimates that about 5–10 percent of the requested increase in rates was attributable to the shutdown of the spring. Hiller Depo. 98:23–99:13.

When Superior bought the water system, it hired MSE–HKM, Inc. to develop a facility plan for the water system and determine whether purchase of the system was feasible for the town. MSE–HKM determined that the current rate base would pay for the cost of purchasing and maintaining the system, and that the 65 percent increase proposed by Mountain Water would be unnecessary. MSE–HKM Plan at 1–1, 1–2 (August 1999). MSE–HKM valued the water system using a cash flow analysis and a valuation of the net cost of the utility plant. Defendants' Facts ¶ 11. MSE–HKM valued Mountain Water's recent capital improvements at $1.5 million and the remainder of the facilities at $100,000. Thus, under the net cost analysis the value was no greater than $1.6 million. Under the cash flow analysis the suggested value was no greater than $1.5 million. Defendants' Facts ¶ 11; MSE–HKM Plan at 5–1–5–6.

In a letter to Mountain Water in 1999, MSE–HKM outlined several engineering deficiencies it believed should be taken into account in determining a price for the system. Defendants' Exhibit K (letter from Swanson & Rowe, MSE–HKM, to Kappes, Mtn. Water, Nov. 4, 1999). Those deficiencies were the lack of fire protection in certain areas of town, poor fire flows in certain areas of town, the need for an additional hydrants and transmission main to protect the hospital and extended care facility, and the need to convert all unmetered users to meters. *Id.* at 1. No mention was made of the need to bring the Plat Creek water source back online. However, in the facility plan, MSE–HKM identified the loss of Flat Creek as one of several significant deficiencies, along with the fire flow problems and need for additional meters. Exh. M, Facility Plan, at 1–2.

Mountain Water sold the water system to the Town of Superior on July 21, 2000. Defendants' Exhibit M (Sale Agreement). The purchase price was $1,220,150. *Id.* at 2 ¶ 6. Mountain Water represented to the Town in the sale agreement that Flat Creek contains elevated antimony; that it has not determined the source of the contamination; and that the water is longer an active part of the water system, although it can be used a backup source. *Id.* at 4 ¶ 11. Moreover, it stated, "Neither DEQ nor any other party asserts that the owner or operator of the System is responsible for any cleanup activities associated with the contamination." *Id.*

Defendants' expert, John R. Burgeson, asserts that MSE–HKM did not assign any value to the Flat Creek spring or its pipeline. Defendants' Facts ¶ 12; Burgeson Report at 5 (Dec. 30, 2002). Plaintiffs have not proffered any testimony in rebuttal, arguing that this is merely an opinion which may be rejected by the trier of fact, and therefore cannot be relied upon as an uncontroverted fact for purposes of sum-

mary judgment. However, this testimony is consistent with the report prepared by MSE–HKM for Superior, which states that Mountain Water had "increased the net value of the utility plant by $1.4 million during the last ten years" through a series of capital improvements, primarily to the transmission and distribution system. Defendants' Exhibit P, MSE–HKM Facility Plan, at 5–4. Those improvements were listed as a new 400,000 gallon storage tank; over 12,000 feet of 10– and 12–inch PVC water transmission main; and installation of a new well pump. Exh. P, Facility Plan, at 1–1. The entire system included three wells, the Flat Creek spring, piping, two storage tanks (one 400,000 gallons, one 25,000 gallons), a chlorination system, three pump houses and a building at the storage tank site housing the control valves and chlorination system. Exh. M, Facility Plan, at 1–1.

Even though the spring had been the primary source of water, the wells were used for drinking water prior to 1997. Hiller Depo. 47:21–48:25. The flow from the spring fluctuated greatly, necessitating a backup system. *Id.*

### A. Defendants' Motion

Defendants' primary argument as to why it is entitled to summary judgment on the contamination of the spring is that the Town (which appears to be the sole plaintiff for this claim) has not incurred any out-of-pocket expenses from the contamination of the spring, and therefore has no compensable damages. Plaintiff responds that whether it paid for the spring when it bought the water system is a disputed issue of fact, and further argue that Asarco is not entitled to judgment as a matter of law. It argues that Asarco created a continuing nuisance and trespass by poisoning a source of drinking water owned by Superior, and whether Superior knew of the contamination when it bought the

water system is legally irrelevant to that ongoing nuisance/trespass.

The evidence is undisputed that the purchase price included the spring, but in its current condition, i.e., useable only as emergency backup. I therefore find that the lack of ascertainable damages as to the spring requires summary judgment in Defendants' favor on both the negligence and nuisance claims.

### B. Plaintiff's Negligence Claim

■ Common law negligence is the failure to use the degree of care that an ordinarily prudent person would have used under the same circumstance. The four elements of a common law negligence claim are duty, breach, causation and damages. Each of these elements must exist for a negligence claim to proceed. *Massee v. Thompson*, 321 Mont. 210, 90 P.3d 394, 400 (2004).

■ Under Montana law, negligence actions are not ordinarily susceptible to summary judgment. *Poole ex rel. Meyer v. Poole*, 299 Mont. 435, 1 P.3d 936, 939 (2000). "However, if a plaintiff fails to offer proof of any one of the elements of negligence (duty, breach, causation, and damages), then summary judgment in favor of the defendant is proper." *Hinkle v. Shepherd School Dist. # 37*, 322 Mont. 80, 93 P.3d 1239, 1243–1244 (2004).

■ Although poorly pled, it appears that Superior is asserting its negligence claim regarding the water system as the owner of the water system, rather than as sovereign on behalf of its citizens or as a purchaser of water whose rates have increased. It has not pled any damages to its citizens, nor has it pled any damages to water system customers. The only damages it seems to claim are those it will either incur because it will be forced to clean up the creek, or those it incurs be-

cause its profit margin is decreased by its inability to use the spring as the primary water source for the town. Neither of these claims is sufficiently certain to withstand summary judgment.

Although it is counterintuitive to imagine leaving Flat Creek spring contaminated, the issue is whether the town *must* clean up the creek, and if so, whether it must do so at its own expense. Only then would the future damages be certain enough to establish a prima facie case of negligence.

The sale agreement between Mountain Water and Superior clearly stated that the owner/operator of the water system is not under any governmental order to clean up the Flat Creek spring. The Town has a stable source of water in the three wells, and emergency backup for fire protection in the spring. No one is drinking the spring water; thus, there is no threat to public health.

Plaintiffs state that, "If the spring were again made safe for human consumption, water could be delivered to Superior in a more reliable, less expensive manner than the current one." Plaintiffs' Statement Genuine Issues ¶ 10. The record belies the claim that the spring is "more reliable" than the wells. See Hiller Depo. 48:8–25 (describing fluctuations in water from the spring). It is true that water delivery from the spring is less expensive because it does not have to be pumped; however, it also appears from the record that cost increases to the water system owner are passed through to the consumer. Hiller Depo. 99:9–10 ("expenses are dollar for dollar to the rates and flow through"). The Town bought the water system with a new pump in place, and did not have to increase rates; thus, the increased costs of pumping the water from the wells appears to be insignificant.

Moreover, to the extent those costs are significant, they are costs that flow through to the water purchasers. In other words, they are damages to the individual purchasers of water, not to the owner of the system. To the extent the town is a purchaser of water, it conceivably could have damages; however, that is not the case that has been brought.

Plaintiffs rely on a report from their expert, David Erickson, that the contamination of the spring "can be abated." Affidavit of David J. Erickson, ¶ 8. The estimate of cleanup is approximately $42.6 million. Exh. A, Asarco's Reply Brief. They rely on this estimate as proof of their damages. But this does not so much resemble a reasonable ascertainment of damages as it does an expensive wish list.

 Generally, a plaintiff is required to prove damages with reasonable certainty. *Smith v. Zepp*, 173 Mont. 358, 567 P.2d 923, 930 (1977). However, "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his act." *Story Parchment Co. v. Paterson Parchment Paper*, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931). In other words, when people have been exposed to toxins that are known to cause harm to humans, but after a long latency period, courts will not force the party who has been exposed to wait for the illness to manifest.

However, this is not a case where determination of damages is inherently difficult because the nature of the injury is self-concealing, or will require future medical care at an uncertain cost. Damages are difficult to determine in this case because they have not been incurred by the plaintiff as a defendant's negligence, nor are they reasonably certain to be incurred in the future. In the absence of reasonably

certain damages, Asarco is entitled to summary judgment regarding its alleged negligence in contaminating the spring.

### C. Statute of Limitations: Negligence

Defendants argue the statute of limitations has run on all of the town's claims related to the spring, as the town learned of the antimony contamination in 1997 and did not file suit until 2001. The town responds that it did not have standing to bring suit until 2000, when it bought the water system, and that the statute did not begin to run until then.

Because the town has brought this case in its capacity as the owner of the water system, I believe it is correct that it lacked standing until it owned the spring, Unfortunately, it has no compensable damages in that capacity.

### D. Nuisance/Trespass Claim Regarding the Spring

Nuisance is defined in Montana by statute as, "Anything which is injurious to health, indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or which unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, river, bay, stream, canal, or basin or any public park, square, street, or highway is a nuisance." MONT.CODE ANN. § 27–30–101(1). "A public nuisance is one which affects, at the same time, an entire community or neighborhood or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." MONT.CODE ANN. § 27–30–102(1). All other nuisances are private. MONT.CODE ANN. § 27–30–102(2).

A private nuisance is a tort against land and the plaintiff's actions must always be founded upon his interest in the land. See Restatement (Second) of Torts §§ 821B, 821D. Nonpossessory interests, such as a water right, can support a private nuisance claim. Rest. Torts (Second) § 821E.

### E. Statute of Limitations: Nuisance

As cited by the Plaintiff, Montana law states that, "No lapse of time can legalize a public nuisance amounting to an actual obstruction of public right." MONT.CODE ANN. § 27–30–201. While the Montana Supreme Court has never interpreted this statute, it is adopted from California law. See MONT.CODE ANN. § 27–30–201, History (citing Cal. Civ. C. Sec. 3490). Other states have incorporated this exact statute into their law. It is therefore helpful to see how other courts have interpreted it.

The Tenth Circuit interpreted this provision in Oklahoma law as follows:

> While the statute of limitations on private nuisance claims under Oklahoma law is two years, see N.C. Corff Partnership, Ltd. v. OXY USA, Inc., 929 P.2d 288, 293 (Okla.App. Div. 4 1996), Okla. Stat. tit. 50, § 7 provides; "No lapse of time can legalize a public nuisance amounting to an actual obstruction of a public right." Concluding, as we have here, that the pollution of Oklahoma waters constitutes a public nuisance under Oklahoma law, the district court of the Western District of Oklahoma, in Fischer v. Atlantic Richfield Co., 774 F.Supp. 616 (W.D.Okla.1989), applied Okla. Stat. tit. 50, § 7 to disallow the two-year statute of limitations as a defense against a plaintiff seeking pollution abatement or the costs of abatement. Id. at 619. We see no reason to reject this existing interpretation of Oklahoma law.

Tosco Corp. v. Koch Industries, Inc., 216 F.3d 886, 895 (10th Cir.2000); see also Mountrail County. v. Hoffman, 607 N.W.2d 901, 903 (N.D.2000) (State By and

*Through Dep't of Transp. v. Garvin,* 456 N.W.2d 779, 782 (S.D.1990) (state allowed to seek injunction against junkyard in operation for more than 10 years)). Contrary to the Tenth Circuit's interpretation, California courts have restricted the statute to public entities who are seeking to abate public nuisances:

> Section 3490 has been construed to mean that the statute of limitations is no defense to an action brought by a public entity to abate a public nuisance. (*Cloverdale v. Smith* (1900) 128 Cal. 230, 235, 60 P. 851; *City of Turlock v. Bristow* (1930) 103 Cal.App. 750, 756, 284 P. 962; 11 Witkin, Summary of Cal. Law, op. cit. supra, Equity, § 124, p. 805.) However, where *private citizens* have sued for *damages for special injury* based on public nuisance, our Supreme Court has characterized the nuisance as either "continuing" or "permanent" and has used the characterization to determine whether the suit is subject to the statute of limitations. As we shall explain, where a private citizen sues for damage from a permanent nuisance, the statute of limitations begins to run upon creation of the nuisance. Where a continuing nuisance is alleged, every continuation of the nuisance gives rise to a separate claim for damages caused by the nuisance.

*Mangini v. Aerojet–General Corp.,* 230 Cal.App.3d 1125, 1142–1143, 281 Cal.Rptr. 827 (Cal.App. 3 Dist.1991).

██ In other words, while some jurisdictions waive the statute of limitations in every case involving a public nuisance, others do so only when a public entity is suing to abate the nuisance. From a policy standpoint, such an approach makes sense. If the Town of Superior is suing to clean up the spring via injunctive relief, the statute of limitations should not bar it from acting in the public interest. But if the Town is suing to recover damages as own-

er of a water company, its public role is nominal, and the statute of limitations should apply as it does in any other damages suit.

Defendant argues that the antimony contamination is not a public nuisance because no one is drinking the water. Montana law defines a public nuisance solely on the basis of how many people are affected by it: i.e., a nuisance "which affects, at the same time, an entire community or neighborhood or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." MONT.CODE ANN. § 27–30–102(1). While the contamination of a spring that used to provide drinking water could be seen as affecting the community of people who drink the water, in this instance the spring was taken out of production in 1997, as soon as the water company learned of the contamination. Superior had a backup water system, and the transition appears to have been seamless.

I therefore conclude that to the extent the Plaintiff seeks damages for contamination of its water right, it is enforcing a private right. To the extent it would seek remediation of the spring by standing in its role as sovereign, I believe it would be viewed as a public entity enforcing a public right. For the former, the statute of limitations would bar any suit beyond three years, while for the latter a statute of limitations defense would be waived.

As discussed by the California court in *Mangini,* the determination of when the statute of limitations begins to run turns on the nature of the nuisance, i.e., whether it is continuing or permanent. Thus, to determine when the statute of limitations began to run for the Town in its role as owner of the water system seeking damages for contamination of the spring, the

Court must decide whether the antimony contamination is continuing or permanent.

### 1. Continuing vs. Permanent Nuisance

■ The Montana Supreme Court, like many other courts, has held that a tort is continuing if it can be "readily abated." *Graveley Ranch v. Scherping,* 240 Mont. 20, 782 P.2d 371 (1989); *Shors v. Branch,* 221 Mont. 390, 720 P.2d 239, 243–44 (1986); *Nelson v. C & C Plywood,* 154 Mont. 414, 465 P.2d 314, 324–25 (1970). In other words, the focus is on the harm caused rather than on the act creating the harm. The issue presented by Plaintiffs herein is whether a proposed cleanup plan with a $42 million pricetag presents a "reasonably abatable" nuisance.

In *Graveley Ranch,* exposed lead acid batteries poisoned and killed plaintiff's cows. The Montana Supreme Court held it was a continuing nuisance because, "This hazardous situation could have been readily abated by removing the ruptured batteries from the site and cleaning the foundation walls." 782 P.2d at 374. Once the defendant erected a fence to keep the cattle away from the toxic batteries, the nuisance became permanent. *Graveley Ranch v. Scherping (Graveley II),* 247 Mont. 310, 806 P.2d 29, 30 (1991).

Similarly, in *Shors,* a gate that blocked access to a river was held to be a continuing tort because the gate could have been easily removed. 720 P.2d at 243–44. The nuisance in *Nelson* arose from the defendant's dumping of glue waste into a drainage ditch adjacent to plaintiff's well. Because the defendant could stop dumping at any time, the nuisance was readily abatable and therefore continuing. 465 P.2d at 325. In another case, the periodic flooding of plaintiff's basement was held to be continuing because plaintiff's damages had not yet become certain. *Haugen Trust v. Warner,* 204 Mont. 508, 665 P.2d 1132, 1135 (1983). However, *Haugen* also stated

that if the flooding were abatable, it could not be permanent. *Id.*

■ In contrast, a permanent nuisance is one where the situation stabilizes and damages can be reasonably ascertained. *Graveley Ranch,* 782 P.2d at 374. For instance, in *Blasdel v. Montana Power Co.,* 196 Mont. 417, 640 P.2d 889 (1982), the rising water table caused by Kerr Dam was held to be temporary as long as the water table was fluctuating, but became permanent when the water table stabilized. *Id.* at 893–94.

Both parties herein cite *Montana Pole & Treating Plant v. I.F. Laucks & Co.,* 993 F.2d 676 (9th Cir.1993), in which the Ninth Circuit affirmed the trial court's grant of summary judgment to the defendants on statute of limitations grounds. There, the plaintiff operated a wood treatment plant in Butte for 38 years, during which time it disposed of a waste chemical, pentacholorophenol, by discharging it untreated into an unlined earthen ditch. Eventually the EPA seized the property under CERCLA and declared the facility a Superfund site. *Id.* at 677. In the case before the Ninth Circuit, Montana Pole was suing the manufacturers of the pentachlorophenol for indemnification. It sought a ruling that the penta contamination was a continuing nuisance so as to justify its failure to file suit within the statutory period. The Ninth Circuit, applying Montana law, relied on the fact that the defendant manufacturer had no control over the release of penta, and could not have abated the release thereof to hold that the nuisance was permanent. *Id.* at 679.

Although *Montana Pole* presents a similar fact pattern because of the chemical contamination, it is legally distinct from the case presented because the creator of the nuisance was the plaintiff rather than the defendant. The case does highlight the importance of the defendant's ability to

stop the nuisance in determining abatability.

Implicit in the Montana cases is the ability of the defendant to stop the nuisance, and the relative ease with which it can do so. Removing a gate, erecting a fence, dumping the glue waste somewhere else—all of these fact patterns illustrate the Montana Supreme Court's understanding of "reasonable abatement." In contrast, the case at bar presents a defendant who is no longer actively discharging chemicals into the water (at least on the record before the Court). Instead, waste products from long ago continue to seep. The only control the Defendant has—and it is not to be minimized—is to remove the tailings and prevent their contaminants from reaching water. This, according to the Plaintiffs, can be done for $42 million.

The California courts have developed a rule that, in order for a nuisance to be continuing, the cost of abatement must be reasonable. *Mangini v. Aerojet–General Corp.*, 12 Cal.4th 1087, 51 Cal.Rptr.2d 272, 912 P.2d 1220, 1229 (1996). There, where the plaintiff's expert testified that the extent of contamination was uncertain, but could be as high as $75 million, the court held that abatement was not reasonable, and that the nuisance was therefore permanent. *Id.* Similarly, in instances where a defendant intends to maintain the nuisance in spite of its illegality, courts have held that the nuisance is permanent, thereby entitling the plaintiff to permanent damages. *See, e.g., O'Brien v. City of O'Fallon,* 80 Ill.App.3d 841, 36 Ill.Dec. 36, 400 N.E.2d 456, 459–60 (1980).

■■■ I believe the Montana Supreme Court cases regarding reasonable abatability imply that "reasonable" has some meaning. However, whether it is a fact question precluding summary judgment, or whether the Court can find as a matter of law that $42 million is unreasonable, is less clear. The determination has conse-quences both for the statute of limitations as well as for damages. However, Asarco is entitled to summary judgment in either case.

If the Court finds that the $42 million cleanup does not create a "reasonably abatable" nuisance, then the nuisance is permanent and the statute of limitations began to run in 1997. Because Plaintiffs did not file suit until 2001, the statute had already run, and Asarco is entitled to summary judgment on statute of limitations grounds.

■■■ On the other hand, if the nuisance is continuing, the Town may proceed with suit. Its damages are restricted to the statutory period prior to filing, i.e., from 1998–2001. No future damages are allowed, as a plaintiff may file suit for a continuing nuisance again and again. Under this scenario, as discussed *infra,* Asarco is still entitled to summary judgment as the Town has *only* future damages. It has not suffered any damages in the statutory period; therefore, its nuisance/trespass claim cannot survive Asarco's motion.

## 2. Damages

As explained by the Restatement in regards to nuisance damages:

an award of damages is retroactive, applying to past conduct, while an injunction applies only to the future. In addition, for damages to be awarded significant harm must have been actually incurred, while for an injunction harm need only be threatened and need not actually have been sustained at all. (See § 821F, Comment b). To maintain a damage action for a public nuisance, one must have suffered damage different in kind from that suffered by the general public; this is not

necessarily true in a suit for abatement or injunction. (See § 821C).

Rest. Torts (Second) § 821B.

 Damages for a continuing nuisance are restricted to the three-year period prior to the filing of the lawsuit; no future damages are allowed. Damages for permanent nuisances, in contrast, can be for past as well as future damages. Damages for nuisance must be to the plaintiff's property interest, and are usually measured by diminution of market value. *See, e.g. O'Brien v. City of O'Fallon,* 80 Ill. App.3d 841, 36 Ill.Dec. 36, 400 N.E.2d 456, 459 (1980); Rest. Torts (Second) § 911, cmt. b ("the value of property ordinarily is determined by the amount paid in actual transactions involving a similar subject matter if the transactions have occurred at or about the time fixed for determining value."). I don't have to look far in this case to determine the fair market value of the Superior water system.

 In some instances, a plaintiff may elect restoration costs rather than loss of market value as a measure of damages. Rest. Torts (Second) § 921(1). But it would distort this rule to apply it to a situation such as the one here, in which the plaintiff bought the property already contaminated. Although the Town could have sued to abate the nuisance, i.e., seek an injunction, it may not seek compensatory damages for restoration to a condition that far exceeds that which it purchased four years ago.

The Town of Superior bought a water system that had a contaminated water source. It was led to believe that it could serve the water customers adequately with the existing system, and all evidence to date supports that belief. The Town has not incurred any out-of-pocket expenses in order to clean the spring up, nor is such cleanup either required or imminent.

Most importantly, the market value of the water system with a contaminated spring was established by the Town's purchase. Although the Town states that it hoped it would be able to abate the contamination, any such abatement would be above and beyond the market value of the water system.

 I fail to see how Superior has suffered any damage to its property right in the spring water. It bought a contaminated spring, and it owns a contaminated spring. Compensatory damages are designed to shift the costs incurred by one party to the other party; where no costs have been incurred, and no costs are reasonably certain to be incurred in the future, the plaintiff has not stated a claim for damages.

Had the Town requested injunctive relief for abatement of a public nuisance, I believe the outcome would be different. The statute of limitations would not run, and the Court could order the defendant (and/or any other necessary parties) to remediate the site. That would not pay the Plaintiff anything directly, however.

For these reasons, I conclude that Plaintiff has failed to muster any evidence of compensatory damages in support of its negligence and nuisance claims regarding contamination of Flat Creek spring. Defendant is therefore entitled to judgment as a matter of law.

## IV. TAILINGS

 Although Asarco initially argued that the statute of limitations had run on the tailings claim, and that Plaintiffs had not provided any evidence of damages, it concedes both of those arguments in its reply brief, focusing instead on the issue of causation. Asarco's Reply Brief at 3 n. 1. I will therefore limit my analysis to whether there are any genuine issues of material fact in dispute regarding causation.

Asarco argues that there is no evidence (1) that Asarco knew mine tailings were being removed from its land, or that it authorized any removal, (2) that Asarco knew the tailings were hazardous at the time they were being removed, which Asarco states was the early 1970s for the school track, and unspecified time periods for other tailings.

Asarco frames this as an intervening cause case, i.e., that the plaintiffs' removal of the tailings from Asarco's land, and subsequent use as road and track underlay in the town and county, was an independent intervening cause of Plaintiffs' injuries. It states that "the question presented by plaintiffs' evidence is whether the plaintiffs' alleged injuries from having brought mine tailings onto their own lands were a reasonably foreseeable consequence of Asarco's failure to stop their unauthorized removal of tailings from Asarco's land, which Asarco did not know was occurring." Asarco's Reply Brief at 5.

Plaintiffs contend Asarco had a duty to warn Plaintiffs' of the dangers of using the tailings, although they do not present any evidence that Asarco knew of those dangers.

Defendant relies on *Estate of Strever v. Cline*, 278 Mont. 165, 924 P.2d 666 (1996), to argue that Plaintiffs' removal of the tailings is an independent intervening cause that was not foreseeable by Asarco, thereby severing the chain of causation. According to Strever, "a defendant's liability for his wrongful act will not be severed by the intervening act of a third party if the intervening act is one that the defendant might reasonably foresee as probable or one that the defendant might reasonably anticipate under the circumstances." *Id.* at 672.

Whether Asarco knew Plaintiffs were using the tailings, whether it was reasonably foreseeable that Plaintiffs would use the tailings, and whether Asarco knew the

tailings were contaminated and posed health threats to Plaintiffs' citizens are all genuine issues of material facts that are disputed by the parties. Summary judgment therefore cannot be granted on Plaintiffs' claims related to the contaminated tailings.

## V. CONCLUSION

Plaintiffs have brought claims of negligence, nuisance, and a violation of their right to a clean and healthful environment based upon antimony contamination of Flat Creek spring, and Plaintiffs' use of contaminated mine tailings as underlay for roads, driveways, and the high school track in Superior. Their claims related to the spring cannot withstand Defendant's motion for summary judgment because Plaintiffs have not proffered any evidence of damages. Their only evidence is the affidavit of their expert, who testified that restoration of the spring would cost $42 million. But because the Town of Superior bought the spring when it was already contaminated, it has no right to full restoration of the spring. It is possible the town could seek an injunction on behalf of its citizens to abate a public nuisance; however, it has no legal right to damages, and Defendant's motion for summary judgment should be granted.

Defendant's motion for summary judgment as to the tailings claim rests on causation alone, as it withdrew its motion as to damages and statute of limitations. There are genuine issues of material fact in dispute regarding causation, however, and summary judgment is not appropriate on this claim.

Accordingly, IT IS HEREBY ORDERED that Defendant's motion for summary judgment (Dkt. # 62) is GRANTED for Counts I and II related to the contamination of Flat Creek spring, and DENIED as to Counts I and II related to the con-

taminated tailings. Count III, the constitutional tort claim, will be certified to the Montana Supreme Court.